Anthony T. Williams
Private Attorney General
Graceville Correctional Facility
ID#: i50147
5168 Ezell Road
Graceville, FL  32440

# UNITED STATES DISTRICT COURT

# DISTRICT OF COLUMBIA

Case: 1:23−cv−01141
Assigned To : Unassigned
Assign. Date : 4/21/2023
Description: Habeas/2255 (G−DECK)
Lower Court No. 17-00101 LEK

**ANTHONY T. WILLIAMS**
Petitioner,

v.

**UNITED STATES OF AMERICA**
Respondent.



RECEIVED
Mail Room

APR 21 2023

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

# MOTION TO VACATE OR SET ASIDE CONVICTION

# TABLE OF CONTENTS

**I.      Grounds**

**II.     Table of Authorities**

**III.    Exhibit List and Contents**

I. PROSECUTION ENGAGED IN THE UNLAWFUL PRACTICE OF SELECTIVE PROSECUTION

II. THE DEFENDANT HAS BEEN UNLAWFULLY PLACED IN DOUBLE JEOPARDY

III. DEFENDANT WAS DENIED EQUAL PROTECTION RIGHTS UNDER THE FOURTEENTH AMENDMENT TO HAVE MEMBERS OF HIS RACE ON THE JURY POOL AND JURY

IV.   CONTINUING TRIAL EIGHT TIMES OVER OBJECTION OF PETITIONER WAS A CONSTITUTIONAL SPEEDY TRIAL VIOLATION

V.   THE STRIKING OF ALL OF DEFENDANT'S WITNESSES FROM THE MAINLAND VIOLATED SIXTH AMENDMENT

VI. INEFFECTIVE ASSISTANCE OF APPEAL COUNSEL

VII. JUDGE KOBAYASHI ERRED IN NOT RECUSING HERSELF WHEN HER IMPARTIALITY WAS QUESTIONED

VIII. DENIAL OF PERTINENT EVIDENCE TO PROVE INNOCENCE WAS A VIOLATION OF THE FIFTH AMENDMENT DUE PROCESS CLAUSE

IX. JUDICIAL BIAS WAS A VIOLATION OF THE FOURTEENTH AMENDMENT

X. MENTIONING OF PREVIOUS ARREST IN FLORIDA IN OPENING STATEMENTS AND DURING TRIAL PREJUDICED THE JURY AGAINST PETITIONER

# TABLE OF AUTHORITIES

**US CONSTITUTION**

U.S. Const. Amend. V.

U.S. Const. Amend. VI

U.S. Const. Amend. XIV


**US SUPREME COURT**

*Price v. Georgia*, 398 U.S. 323, 329, 90 S. Ct. 1757, 26 L. Ed 2d 300 (1970)

*North Carolina v. Pearce*, 395 US 711, 717, 23 L Ed 2d 656, 89 S. Ct 2072 (1969)

*Green v. United States*, 355 U.S. 184, 187, 2 L Ed 2d 199, 78 S. Ct. 221 (1957).

*Helvering v. Mitchell*, 303 U.S. 391, 399, 82 L Ed 917, 58 S. Ct. 630.

*United States v. Burkett,* 612 F. 2d 449, 452 (9th Cir. 1979)(discussing Guido), cert. denied, 447 U.S. 905, 100 S. Ct. 2985, 64 L. Ed 2d 853 (1980),

*Batson v. Kentucky,* 476 U.S. 79,, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986)

*Brown v. Board of Education*, 347 U.S. 483, 74 S. Ct. 686, 98 L. Ed. 873 (1954)

*Carter v. Texas*, 177 U.S. 442, 447, 20 S. Ct. 687, 44 L. Ed. 839 (1900);

*Norris v. Alabama*, 294 U.S. 587, 597-599, 55 S. Ct.579, 79 L. Ed. 1074 (1935);

*Hale v. Kentucky,* 303 U.S. 613, 616, 58 S. Ct. 753, 82 L. Ed. 1050 (1938)(per curiam);

*Pierre v. Louisiana*, 306 U.S. 354, 362, 59 S. Ct. 536, 83 L. Ed. 757 (1939)

*Smith v. Texas*, 311 U.S. 128, 130-131, 61 S. Ct. 164, 85 L. Ed. 84 (1940);

*Avery v. Georgia*, 345 U.S. 559, 562, 73 S. Ct. 891, 97 L. Ed 1244 (1953);

*Hernandez v. Texas*, 347 U.S. 475, 477-478,, 482, 74 S. Ct. 667, 98 L. Ed. 866 (1954);

*Coleman v. Alabama*, 377 U.S. 129, 133, 84 S. Ct. 1152, 12 L. Ed. 2d 190 (1964).

*Swain v. Alabama,* 380 U.S. 202, 85 S. Ct. 824, 13 L. Ed 2d 759 (1965)

*Flowers v. Mississippi*, 588 US_, 39 S. Ct._,204 L. Ed. 2d 638, 2019 US LEXIS 4196 (2019)

Foster, 578 U.S. ___, 136 S. Ct. 1737, 195 L. Ed. 2d 1;

*Snyder v. Louisiana*, 552 U.S. 472, 128 S. Ct. 1203, 170 L. Ed. 2d 175 (2008);

*Miller-El v. Dretke*, 545 U.S. 231, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005)(Miller-El II).

*Powers*, 499 U.S., at 406, 111 S. Ct. 1364, 113 L.Ed. 2d 411.

*J.E.B. v. Alabama ex rel.* T.B., 511 U.S. 127, 129, 114 S. Ct. 1419, 128 L. Ed. 2d 89(1994);

*Georgia v. McCollum,* 505 U.S. 42, 59, 112 S. Ct. 2348, 120 L. Ed. 2d 33 (1992);

*Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 616, 111 S. Ct. 2077, 114 L. Ed. 2d 660 (1991).

*Chapman v. California,* 386 U.S. 18, 23 n. 8, 87 S.Ct. 824, 827-28 n. 8, 17 L.Ed.2d 705 (1966)

*Liteky v. United States,* 510 U.S. 540, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994).


## FEDERAL COURT

*Oyler v. Boles,* 368 U. S. 448, 456

*Ah Sin v. Wittman,* 198 U. S. 500.

*Batson v. Kentucky,* 476 U. S. 79

 *Hunter v. Underwood,* 471 U. S. 222

*Wade v. United States,* 504 U. S. 181

*United States v. Felix,* 503 U.S. 378, 387 (1992).

*Guido v. United States,* 597 F. 2d 194 (9th Cir. 1979)

*United States v. Allen,* 539 F. Supp. 296 (9th Cir. 1982)

*United States v. Basurto,* 497 F. 2d 781, 793

*Neal v. Delaware,* 103 U.S. 370, 397, 26 L. Ed. 567 (1881);

*Strauder v. West Virginia,* 100 US 303, 25 L Ed. 664

Burkett v. Cunningham, 826 F.2d 1208 (3d Cir. 1987)

*Smith v. Robbins,* 528 U.S. 259, 285-86 (2000)

*United States v. Cook,* 45 F.3d 388, 392 (10th Cir. 1995)

*Roe v. Flores-Ortega,* 528 U.S. 470 (2000)

*Milton v. Miller,* 744 F.3d 660 (10th Cir. 2014)

*Jackson v. Leonardo,* 162 F.3d 81 (2d Cir. 1998)

*Ludwig v. United States,* 162 F.3d 456 (6th Cir. 1998).

*Maurino v. Johnson,* 210 F.3d 638 (6th Cir. 2000)


## STATE COURT

*State v. McNallie,* 64 Wn. App. 101 (Wash. Ct. App. 1992)

*State v. Gordon,* 26 Ohio App. 2d 270 (Ohio Ct. App. 1971)

*State v. Buhl,* 520 N.W.2d 177 (Minn. Ct. App. 1994)

*People v. Mitcham,* 1 Cal. 4th 1027, 5 Cal. Rptr. 2d 230, 824 P. 2d 1277, 1992 Cal. LEXIS 1269 (1992)

State v. Vigil-Giron, 327 P.3d 1129 (N.M. Ct. App. 2014),

Garza, 2009–NMSC–038, ¶ 2, 146 N.M. 499, 212 P.3d 387

Spearman, 2012–NMSC–023, ¶ 21, 283 P.3d 272

Lissa Griffin, The Right to Effective Assistance of Appellate Counsel, 97 W. Va. L. Rev. 1 (1994)


**FEDERAL LAW**

18 USC 243

28 U.S.C. § 144

28 U. S. Code   § 455

Civil Rights Act of 1875. Ch. 114, 18 Stat. 335.

# EXHIBIT LIST AND CONTENTS

*Exhibit 1 – Trial Transcript Day 4, Pg. 14 Lines 2- 25; Pg. 15. Lines 1 - 23) – Lavelle Testimony No whites indicted*

*Exhibit 2 – Trial Transcript Day 3, Pg.156 Lines 12-25; Pg. 157, Lines 1-5; Pg. 158 Lines 20-25; Pg. 159 Lines 1-16 ) – Lavelle Testimony that FBI opened investigation based on a statement made at a seminar and not a probable cause that a crime had been committed.*

*Exhibit 3 – Trial Transcript Day 3; Pg. 180 Lines 2-25. Pg. 183 Lines 9-20) – US Attorneys office declined prosecution in Miami.*

*Exhibit 4 – Trial Transcript Day 3, Pg. 167 Lines 9-25) –* Lavelle Testimony that he knew of a White woman named Donna Hickenbottom, but did not charge, indicted or arrested her.

*Exhibit 5 - Trial Transcript Day 4, Pg. 13, Pg. 14 Lines 2- 25. Pg. 15. Lines 1 - 23) - Lavelle Testimony that no White or Asian employees were arrested, charged or indicted.*

**Exhibit 6 - Trial Transcript Day 5, Pg. 36 Lines 8-25; Pg. 37 Lines 1-8; Pg. 39 Lines 18-25; Pg. 40 Lines 1-12) -** Kobayashi struck all defense witnesses from mainland from testifying.

**Exhibit 7 - Trial Transcript Day 3, Pg. 168 Lines 1- 14; Pg.171 Lines 24-25; Pg.172 Lines 1-24; Pg.173 Lines 1- 8) -** Lavelle Testimony that "No clients in other states made complaints against defendant."

**Exhibit 8 - Trial Transcript Day 3, pgs.185 -190) – Sorenson's disclosure of Florida conviction.**

**Exhibit 9 - Trial Transcript Day 4, pg. 8) – Sorenson's opening statements, intentionally disclosed Florida arrest.**

**Exhibit 10 - Trial Transcript Day 3 pgs. 151 -154, Pgs. 192-194) - Kobayashi denied transcripts of Lavelle's testimony in Florida case to be entered into evidence.**

**Exhibit 11 - Trial Transcript Day 3 Pgs. 171-175 – Lavelle's testimony, "NO clients made any complaints against the defendant," in other states.**

**Exhibit 12 - Trial Transcript Day 2, Pg. 167-182 – A Juror believed that "the defendant was already guilty," before hearing the case and she did not want her daughter to work for CLOA.**

**Exhibit 13 - Jury Trial Day 7, pg. 113 Lines 7-20 - Judicial Bias Kobayashi "coaching prosecutor," to object to questioning by the defendant.**

**Exhibit 14  - Letter to Dotson to recuse herself and/or to file appealable grounds for the defendant.**

**Exhibit 15- page 2, paragraph 5 - Dr. Horowitz support letter for the defendant.**

## MOTION TO VACATE OR SET ASIDE CONVICTION

COMES NOW, the defendant by the undersigned common law counsel, who is a servant of the Most-High Yahweh Elohim Yahshua and files this Motion to Vacate or Set Aside Conviction. In support of this motion the undersigned states the following facts:

## I. PROSECUTION ENGAGED IN THE UNLAWFUL PRACTICE OF SELECTIVE PROSECUTION

Defendant and his mother were the only people the U.S. Department of Justice (DOJ) has selected for indictment that worked for Mortgage Enterprise Investments or Common Law Office of America. During the FBI's investigation, the DOJ has repeatedly declined to fully investigate, much less charge, individuals who were Caucasian engaged in the exact same business as Private Attorney General Anthony Williams who were employees or partners in his business. PAG Williams has obtained concrete proof that the government improperly targeted him for criminal prosecution because he is African American.  This direct evidence includes the following:

### A. Declaration from Dr. Leonard G. Horowitz

A declaration filed in this case by Dr. Leonard Horowitz, a world renown whistleblower and New York Times best selling author, outlines that PAG Williams was targeted because of his race.(***See Exhibit 15,  page 2, paragraph 5).***

### B. Testimony from FBI Special Agent Joseph Lavelle

PAG Williams and his mother were the only people who worked for MEI and CLOA that has ever been selected for prosecution under the Mail and Wire Fraud Act,[1] and the only people ever prosecuted in remotely similar circumstances, and because he has uncovered specific direct admissions from the government that he was targeted for criminal investigation because he is African American and thus proven selective prosecution.

---

[1] At PAG Williams trial on Day 3 and 4, February 5-6, 2020, FBI Special Agent Joseph Lavelle conceded that PAG Williams was the only person who has ever been put on trial and none of his white or Asian employees were investigated, charged, indicted nor arrested.  (***See  Exhibit 1 -  Trial Transcript Day 4, Pg. 14 Lines 2- 25. Pg. 15. Lines 1 - 23).***

This motion summarizes compelling evidence that the DOJ had an informal policy of refusing to bring criminal charges in situations similar to and (even more egregious than) what PAG Williams was charged with. In addition, PAG Williams provided several specific examples of similarly situated individuals whom the government has chosen not to indict for mail and wire fraud or any charges in connection with the CLOA or MEI business. Unlike the meritless selective prosecution discovery motions discussed in <u>Armstrong</u>, where several thousand men and women of all races had been charged under the same statutes as the defendants, PAG Williams can conclusively establish that he and his mother were the only people whom the government chose to indict that worked for Mortgage Enterprise Investments or Common Law Office of America. The other two darker Filipinos, Anabel Cabebe and Henry Malinay did not work for MEI or CLOA and were charged based on the fraudulent company they set up with Edna Franco and Rowena Valdez who also were never charged, indicted or arrested.

## A. FACTUAL BACKGROUND
### The Indictment

On February 17, 2017 the government brought <u>a thirty-two-count indictment against</u> PAG Anthony Williams. Sixteen counts allege that PAG Williams violated the mail fraud act by purportedly making false statements, misrepresentations or omissions with the intent to defraud banks, mortgage companies and clients through the mail and with the intent to obtain funds unlawfully. PAG Williams was also charged with sixteen counts of wire fraud by allegedly making false statements, misrepresentation, and omissions via email with the intent to defraud banks, mortgage companies and clients through email and with the intent to obtain funds unlawfully.

## B. THE LEGAL STANDARD REGARDING SELECTIVE PROSECUTION

Under the equal protection component of the Fifth Amendment's Due Process Clause, the decision whether to prosecute may not be based on an arbitrary classification such as race or religion. <u>Oyler v. Boles</u>, 368 U. S. 448, 456. In order to prove a selective-prosecution claim, the claimant must demonstrate that the prosecutorial policy had a discriminatory effect and was motivated by a discriminatory purpose. Ibid.

To establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted. _Ah Sin v. Wittman_, 198 U. S. 500. _Batson v. Kentucky_, 476 U. S. 79, and _Hunter v. Underwood_, 471 U. S. 222, distinguished. Although Ah Sin involved federal review of a state conviction, a similar rule applies where the power of a federal court is invoked to challenge an exercise of one of the core powers of the Executive Branch of the Federal Government, the power to prosecute. Discovery imposes many of the costs present when the Government must respond to a prima facie case of selective prosecution. Assuming that discovery is available on an appropriate showing in aid of a selective-prosecution claim, see _Wade v. United States_, 504 U. S. 181, the justifications for a rigorous standard of proof for the elements of such a case thus require a correspondingly rigorous standard for discovery in aid of it. Thus, in order to establish entitlement to such discovery, a defendant must produce credible evidence that similarly situated defendants of other races could have been prosecuted, but were not.

## C. PAG WILLIAMS MORE THAN MEETS THE LEGAL STANDARD REGARDING SELECTIVE PROSECUTION

As demonstrated below, PAG Williams clearly meets the legal standard that Armstrong established a selective prosecution claim. In Part A, he presented direct evidence that government officials have admitted a racial basis for investigating PAG Williams, and in Part B, he established that the government has declined to prosecute similarly situated persons.

## 1. PAG Williams has Direct Evidence that He was Targeted for Criminal Investigation Because He is "African-American"

The troubling chain of events that led to PAG Williams' indictment began when the FBI in Miami wrongfully concluded that he was engaged in money laundering, bank fraud, mortgage fraud, mail and wire fraud.  Agent Joseph Lavelle of the Miami office stated at trial that the reason they opened an investigation against PAG Williams was because he attended a seminar in Ventura Beach, California where PAG Williams quoted a US Supreme Court ruling stating a citizen can resist an unlawful detainment or arrest even to the point of taking that arresting officer's life. (*See Exhibit 2 - Trial Transcript Day 3, pg. 156 Lines 12-25; pg. 157, Lines 1-5; pg. 158 Lines 20-25; pg. 159 Lines 1-16).*

The FBI then opened a criminal investigation of PAG Williams with no probable cause or evidence of a crime. After the investigation, the FBI in Miami sent their charges to the Miami US Attorneys office who scrutinized the investigation of the FBI and determined that there was NO crime committed by PAG Williams and DECLINED PROSECUTION. *(See Exhibit 3 - Trial Transcript Day 3; Pg. 180 Lines 2-25. Pg. 183 Lines 9-20).*

## 2.  FBI Agent Joseph Lavelle's Testimony Establishes that the Government Engaged in Improper Racial Profiling

FBI Agent Joseph Lavelle confirmed that PAG Williams was illegally selected for prosecution when he testified that he specifically KNEW of a white similarly situated subject, Donna Hickenbottom, who was engaged in the same business conduct but chose not to arrest or indict her. *(See Exhibit 4 - Trial Transcript Day 3, Pg. 167 Lines 9-25).* Lavelle goes on further to testify that not one white or Asian employee in none of the states they investigated were charged, indicted or arrested. *(See Exhibit 5 - Trial Transcript Day 4, Pg. 13, Pg. 14 Lines 2- 25. Pg. 15. Lines 1 - 23).*

The government had listed on their witness list Kalena Franks, a white woman that worked in the Hawaii office of CLOA and MEI but did not indict her or charge her. In addition to Kalena, the prosecutors failed to indict or arrest PJ Stewart, a white woman who is also a Private Attorney General that worked out of the Hawaii office of CLOA and MEI. Furthermore, there were six more white similarly situated subjects that worked in other offices in other states that the prosecution failed to indict who were engaged in the exact same conduct and worked for the exact same company of the defendant. Two of these white employees, Robyn Kelley and Rene Powers were issued subpoenas to testify on defendant's behalf and they were struck from testifying by Judge Kobayashi in the middle of trial. **(See Exhibit 6 - Trial Transcript Day 5 Motion to Quash, Pg. 36 Lines 8-25, Pg. 37 Lines 1-8; Pg. 39 Lines 18-25, Pg. 40 Lines 1-12).**

The FBI office and US Attorneys office chose to focus specifically on PAG Williams because he is an "African-American, whereas, Caucasians with the same background, working for the same company, out of the same offices as PAG Williams were ignored.

## 3.  Evidence that Similarly Situated Individuals Have Never Been Prosecuted

It is clear that race played an impermissible role for selecting PAG Williams for prosecution. No Caucasian or Asian employee of CLOA or MEI has ever been prosecuted in any state or federal charges. FBI Special Agent Joseph Lavelle, conceded this fact at the February 5-6, 2020 Trial. See fn.1, supra. Evidence that similarly situated individuals have not been prosecuted can be found in both statements and testimonies of FBI Agents Megan Crawley and Joseph Lavelle, concerning the practices of the DOJ in declining to prosecute similar or more egregious cases, as well as specific examples of similarly situated individuals that the DOJ declined to charge. (**See Exhibit 1 - Trial Transcript Day 4, Pg. 14 Lines 2- 25. Pg. 15. Lines 1 - 23).**

Not only had there been no other prosecutions of Caucasian employees that worked for CLOA and/or MEI, the DOJ had a policy of not bringing cases such as this with complaints against Caucasians.  Further evidence that DOJ has never prosecuted similarly situated individuals can be found in the Department's apparent blanket refusal to bring criminal charges against Caucasian employees engaged in the same business, processing the same paperwork for the same clients PAG Williams was charged with. By contrast, PAG Williams did not have any client's complaint filed against him to the FBI nor Office of Consumer Protection (OCP). However, he and his mother were the only staff of CLOA and MEI that were charged, indicted, arrested, incarcerated and convicted.

PAG Williams has presented credible evidence in the form of specific statements made by investigators in this case that "race" was a factor in selecting PAG Williams for prosecution. Moreover, he has presented some evidence of not two, but several individuals engaged in the same business working for the same company, out of the same office, without facing criminal charges of any kind, much less, a thirty-five year prison sentence, notwithstanding there were no complaints filed against PAG Williams as testified by FBI Agent Joseph Lavelle, (**See Exhibit 7 - Trial Transcript Day 3, Pg. 168 Lines 1- 14; Pg. 171 Lines 24-25 Pg. 172 Lines 1-24 Pg. 173 Lines 1- 8).**

**II. THE DEFENDANT HAS BEEN UNLAWFULLY PLACED IN DOUBLE JEOPARDY**

The double jeopardy clause of the Fifth Amendment, made applicable to the states through the Fourteenth Amendment, provides that no person shall "be subject for the same offence to be twice put in jeopardy of life of limb" U.S. Const. Amend. V. "It has long been settled under the Fifth Amendment that a verdict of acquittal is final, ending a defendant's jeopardy, and even when not followed by any judgment, is a bar to a subsequent prosecution for the same offence." Green, 355 U.S. at 188, 78 S. Ct. 221. An acquittal on a greater offense generally bars a second prosecution for any lesser included offenses. See Brown, 432, U.S. at 169, 97 S. Ct. 2221("The Double Jeopardy Clause is not such a fragile guarantee that prosecutors can avoid its limitations by the simple expedient of **DIVIDING A SINGLE CRIME** into a **SERIES OF TEMPORAL or SPATIAL UNITS.**") (emphasis added): see also _Price v. Georgia_, 398 U.S. 323, 329, 90 S. Ct. 1757, 26 L. Ed 2d 300 (1970)

The instant case is one that the government alleged that the undersigned's mortgage documents and UCC filings are fraudulent and that the undersigned used the mail and wire in furtherance of this alleged scheme even though there was no scheme to defraud. The undersigned was taken to trial in Florida for the same lawful business conduct of fighting illegal foreclosures by filing valid mortgage documents and UCC's to protect the homeowners from imminent foreclosure. In that trial, the prosecution alleged that the mortgage documents and the UCC's were fraudulent and that the undersigned had no lawful authority to have them filed even though the documents were previously approved by governmental agencies for filing. The Hawaii Federal Prosecutors "KNEW" of the defendant's illegal prosecution and unlawful conviction in Florida, for the SAME business conduct and transactions, and they STILL filed federal charges, alleging the **SAME CONDUCT** was fraudulent, and instead of filing Unlawful Filing of Documents and Grand Theft of a house charges, the Hawaii Federal Prosecutors filed charges for mail and wire fraud based on the **SAME CONDUCT** that the undersigned was tried and unlawfully convicted of in Florida. The Hawaii Federal Prosecutors **DIVIDED** a single crime into a **SERIES OF TEMPORAL** or **SPATIAL UNITS** and charged the defendant with mail and wire fraud based on the **SAME CONDUCT** that the defendant was tried and unlawfully convicted of in Florida. The U.S. Supreme Court ruled on this issue when it stated, "This court many times has held that Double Jeopardy Clause protects against three distinct abuses: a second prosecution for the same offense after acquittal; a second prosecution for the

**SAME OFFENSE AFTER CONVICTION**; and multiple punishments for the **SAME OFFENSE**." *North Carolina v. Pearce*, 395 US 711, 717, 23 L Ed 2d 656, 89 S. Ct 2072 (1969). In the context Double Jeopardy principles protects against government over reaching and that proposition is extremely important because the states and federal government have an enormous array of civil administrative sanctions at their disposal that are capable of being used to punish persons repeatedly for the same offense, violating the bedrock double jeopardy principle of finality. "The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the state with all of its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity." *Green v. United States*, 355 U.S. 184, 187, 2 L Ed 2d 199, 78 S. Ct. 221 (1957).

The State of Florida has procured an unlawful conviction for the same actions outlined in the indictment and the State of Hawaii issued an unlawful civil sanction for the same business actions and now the Hawaii Federal Prosecutors has filed charges and procured an unlawful conviction by an all white and all Asian jury for the **THIRD TIME** for the same lawful business actions. This clearly violates the double jeopardy principle which the U.S. Supreme Court ruled again, the double jeopardy clause it noted: "prohibits merely punishing twice, or attempting a second time to punish criminally, for the same offense." *Helvering v. Mitchell*, 303 U.S. 391, 399, 82 L Ed 917, 58 S. Ct. 630.

The double jeopardy clause protects against multiple prosecutions for the same offense, but the introduction of relevant evidence of particular misconduct in a case, is not the same thing as prosecution for that conduct. *United States v. Felix*, 503 U.S. 378, 387 (1992). Here the government has punished the undersigned a **THIRD TIME** for a lawful business the undersigned has conducted for 17 years and have also been unlawfully convicted in Florida for and thus, this clearly violates the double jeopardy clause and is grounds for dismissal of the superseding indictment.

The government on January 22, 2020, filed the Government's Trial Brief under document No. 791 under section III. **PRIOR CONVICTION AND COURT ORDERS**, the government unwittingly admitted on page 5 of that brief, that the undersigned "had already been tried and convicted of the **SAME CONDUCT**," thus proving by their own assertion,

that the undersigned had been subjected to "double jeopardy." While the undersigned was going through the Florida case, the government placed a hold on the undersigned and after the defendant was unlawfully convicted, the government filed a writ to transfer the undersigned from the custody of the Florida State Prison and was transferred to Hawaii to face charges, stemming from the **SAME ACTIONS** and from the same evidence seized from the Miami FBI office, which actually **DECLINED PROSECUTION**, because they found NO evidence of a federal crime. (**See Exhibit 3- Trial Transcript Day 3, Pg. 180 Lines 2-25. Pg. 183 Lines 9-20**). In its brief, the government states on page 5 that,

"The facts underlying these convictions are **DIRECT** PROOF of the existence of the **CHARGED SCHEME**, that is, they arise from the **SAME SCHEME** to defraud homeowners through the sale of a bogus mortgage rescue service. In Florida, Williams was convicted of marketing a service whereby he, as an attorney, could perform the magical act of making mortgages disappear... the Florida conviction involves the **SAME SCHEME TO DEFRAUD** with Florida victims."

The government had clearly placed the defendant and the undersigned in "double jeopardy," by indicting the defendant on the filing of documents and his business practices, which he was previously tried and unlawfully convicted of in the State of Florida. The Hawaii Federal Prosecutors **KNEW** that the defendant had been convicted for conducting the **SAME BUSINESS** using the **SAME DOCUMENTS** and process in Florida and was constantly in contact with the Florida State Attorney and the FBI in Florida. In order to try to circumvent the double jeopardy clause of the Fifth Amendment, the Hawaii Federal Prosecutors filed different charges than the ones filed in Florida, and used the **SAME DOCUMENTS** and business process, to procure an indictment. The defendant has been tried and unlawfully convicted for the filing of the mortgage documents, UCC filings and the MEI program that the Hawaii Federal Prosecutors has indicted the defendant on, which arose out of the **SAME** transactions and business, using the **SAME BANK ACCOUNTS** that was used in Florida.

In 2016, the undersigned was indicted by the State of Florida for operating the SAME BUSINESS and was unlawfully tried and convicted in 2017. The State of Florida alleged that the undersigned made false statements (the same charges the Hawaii Federal Prosecutors were alleging in its indictment), and filed fraudulent mortgages and UCC

documents (the same that the government is alleging in its indictment), to obtain property or money from homeowner (the same thing that the government is alleging in its' indictment). The government's indictment alleged the **EXACT SAME THING** based on the **SAME CONDUCT** and **TRANSACTIONS** that transpired **DURING THE SAME TIME**. These are clearly in violation of the "double jeopardy principle," as the Ninth Circuit has previously ruled, "Dismissal of an indictment pursuant to the courts supervisory power may be appropriate where the indictment charges an offense nearly **IDENTICAL** to one previously tried. *Guido v. United States*, 597 F. 2d 194 (9th Cir. 1979) (per curiam)." In Guido, the defendant had entered a "plea of guilty" to an indictment brought in the Eastern District of California charging them with "conspiracy to import marijuana." A year later, a federal grand jury in Arizona returned an indictment against the defendants charging them, inter alia, with conspiracy to possess marijuana with intent to distribute. Prior to filing of the second indictment, the Arizona prosecutor had learned of the California prosecution and its underlying facts. The defendant sought dismissal of the Arizona indictment on "double jeopardy" and due process grounds, claiming that it charged the same offense as the California indictment. The District Court denied the motion to dismiss and the defendants were subsequently tried and convicted. On appeal, the defendant renewed their constitutional challenges to the indictment. The Ninth Circuit declined to reach those claims, however, **REVERSING THE CONVICTIONS UNDER IT'S SUPERVISORY POWER** instead. The court compared the two conspiracies and concluded that they involved the **SAME OBJECTIVES**, the **SAME KEY PARTICIPANTS** (defendants), the **SAME METHOD OF OPERATION** and the **SAME PERIOD OF TIME**. Although the conspiracies were separately punishable. See *United States v. Burkett,* 612 F. 2d 449, 452 (9th Cir. 1979)(discussing Guido), cert. denied, 447 U.S. 905, 100 S. Ct. 2985, 64 L. Ed 2d 853 (1980), the court nevertheless, viewed the **SECOND PROSECUTION** as **INHERENTLY UNFAIR**. Despite a difference in participants between the two conspiracies, the court found the offenses practically **INDISTINGUISHABLE** since they shared the **SAME PURPOSE**, that of importing and distributing marijuana. See Id. The Arizona Prosecutor's knowledge of the California indictment, should have put him on notice that he was charging defendants with virtually the **SAME OFFENSE**.  Nevertheless, they brought the indictment. The court **INVOKED ITS SUPERVISORY POWER TO CORRECT SUCH AN 'UNJUST RESULT'**. Guido provides strong support for dismissing the indictment in this case. Even if the conspiracy offense charged in the two

15

indictments are "separately punishable," they are virtually "identical" in terms of proof. The only distinction between the two conspiracies charged, is the difference in the supplier to Hughes, a factor which the Guido court did not consider as significant. More importantly, both consequences, "conspiracies" involve the **SAME PURPOSE**, to defraud Hughes, a factor which the court did find significant in Guido. Furthermore, as in Guido, the prosecutor KNEW about the two conspiracies, when the decision was made to seek separate prosecutions. Thus, Guido's holding that "two separate conspiracies" are "identical," except for a minor difference in participants, must be tried together, applies with full force here. The Prosecution under the second indictment, would result in unnecessary harassment of the defendants and **THE COURT MUST NOT PERMIT SUCH AN INJUSTICE**. As to the substantive counts, Guido also compels dismissal. The new mail fraud counts are virtually identical to the new conspiracy count; indeed, every mailing alleged under section 1341, is also "alleged," as an overt act of the conspiracy. The same facts underlie both the substantive counts and the conspiracy, and therefore, Guido would require joinder of those offenses. Since the new conspiracy count should have been joined in the first indictment, it follows that the new substantive counts, should also have been joined. Alternatively, the separate trials on mailings connected by the **SAME SCHEME TO DEFRAUD** would be **GROSSLY UNJUST**. *United States v. Allen,* 539 F. Supp. 296 (9th Cir. 1982). "Given that the offenses charged in the second indictment are nearly identical to those previously tried, the court concludes that "further prosecution of defendants would be oppressive." The government's failure to act with due regard for the integrity of the administration of justice, *United States v. Basurto*, 497 F. 2d 781, 793 (Hufstedler, J., concurring), makes this an appropriate case for exercising the courts supervisory power and accordingly, the indictment MUST BE DISMISSED. Allen supra. (emphasis added).

The government on its **OWN ADMISSION**, admitted that "they charged the defendant for the **SAME CONDUCT** he was unlawfully convicted of in Florida thus, proving by their own statements, they knew that by bringing these charges for the **SAME CONDUCT** would be oppressive and subject the undersigned to double jeopardy. The Hawaii Federal Prosecutors acted with undue regard for the integrity of the administration of justice.

## III. DEFENDANT WAS DENIED EQUAL PROTECTION RIGHTS UNDER THE FOURTEENTH AMENDMENT TO HAVE MEMBERS OF HIS RACE ON THE JURY POOL AND JURY

In the voir dire process, the undersigned noticed that there were no African-Americans, Hispanics, Hawaiians, Filipinos, Samoans, Fijians, Chinese, Koreans, Portuguese or other "local races" on the juror panel to choose from. Hawaii is a "melting pot" of multi-races from all over the World. The undersigned brought this to the attention of the court and objected to this due process violation, citing the U.S. Supreme Court case *Batson v. Kentucky*, 476 U.S. 79,, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). The court completely ignored the undersigned's objection and proceeded with the voir dire and the empaneling of the jurors. What was quite disturbing was, the majority of the jurors were either Asians (specifically of Japanese descent) or Caucasian. The reason the defendant noticed this as especially significant, was because the judge in this instant case, is an Asian (Japanese descent), the Hawaii Federal Prosecutors and the FBI Agent are of Caucasian descent respectively, and the undersigned is African-American. The optics is quite clear that the "chosen jurors" were not a jury of the undersigned's peers and was, in fact, empaneled because the prosecution "KNEW" that by empaneling an all-White and Japanese jury, that regardless of what evidence the defendant presented to the jury, they would have a certain bias against the undersigned due to his race.

In 1875, to help enforce the Fourteenth Amendment, Congress and the President Ulysses S. Grant, signed the Civil Rights Act of 1875. Ch. 114, 18 Stat. 335. Among other things, that law made it a criminal offense for state officials to exclude individuals from jury service on account of their race. 18 USC 243. The Act provides: "No citizen possessing all other qualifications which are or may be prescribed by law shall be disqualified for service as grand or petit juror in any court of the United States, or of any State on account of race, color, or previous condition of servitude." As the Court later explained in *Brown v. Board of Education*, 347 U.S. 483, 74 S. Ct. 686, 98 L. Ed. 873 (1954), the Court's decisions in the Slaughter-House Cases and Strauder interpreted the Fourteenth Amendment "as proscribing all state-imposed discriminations against the Negro race including jury service." *Brown*, 347 U.S., at 490

In the decades after Strauder, the Court reiterated that States may not discriminate on the basis of race, in jury selection. See, e.g., *Neal v. Delaware*, 103 U.S. 370, 397, 26 L. Ed. 567 (1881); *Carter v. Texas*, 177 U.S. 442, 447, 20 S. Ct. 687, 44 L. Ed. 839 (1900); *Norris v. Alabama*, 294 U.S. 587, 597-599, 55 S. Ct.579, 79 L. Ed. 1074 (1935); *Hale v. Kentucky,* 303 U.S. 613, 616, 58 S. Ct. 753, 82 L. Ed. 1050 (1938)(per curiam); *Pierre v. Louisiana*, 306 U.S. 354,

17

362, 59 S. Ct. 536, 83 L. Ed. 757 (1939); *Smith v. Texas*, 311 U.S. 128, 130-131, 61 S. Ct. 164, 85 L. Ed. 84 (1940);

*Avery v. Georgia*, 345 U.S. 559, 562, 73 S. Ct. 891, 97 L. Ed 1244 (1953); *Hernandez v. Texas*, 347 U.S. 475, 477-478,,

482, 74 S. Ct. 667, 98 L. Ed. 866 (1954); *Coleman v. Alabama*, 377 U.S. 129, 133, 84 S. Ct. 1152, 12 L. Ed. 2d 190

(1964).

However, critical problems persisted.  Even though laws barring blacks from serving on juries were unconstitutional

after Strauder, many jurisdictions employed various discriminatory tools to prevent black persons from being called for

jury service. And when those tactics failed, or were invalidated, prosecutors could still exercise peremptory strikes in

individual cases, to remove most or all black prospective jurors. In the aftermath of Strauder, the exclusion of black

jurors became more covert and less overt-often accomplished through peremptory challenges in individual courtrooms,

rather than by blanket operation of law. But as the Supreme Court later noted, the results were the same for black jurors

and black defendants, as well as for the black community's confidence in the fairness of the American criminal justice

system. See *Batson*, 476 U.S., at 98-99,, 106 S. Ct. 1712, 90 L. Ed. 2d 69.

Eighty-five years after Strauder, the Court decided *Swain v. Alabama,* 380 U.S. 202, 85 S. Ct. 824, 13 L. Ed 2d 759

(1965). The defendant Swain was black. Swain was convicted of a capital offense in Talladega County, Alabama, and

sentenced to death. Swain presented evidence that NO BLACK JURORS had served on a jury in Talladega County in

more than a decade. See id., at 226, 85 S. Ct. 824, 13 L. Ed. 2d 759. And in Swain's case, the prosecutor struck all six

qualified black prospective jurors, ensuring that Swain was tried before an all-white jury. Swain invoked Strauder to

argue that the prosecutor in his case had impermissibly discriminated on the basis of race, by using peremptory

challenges to strike six black prospective jurors. See 380 U.S., at 203, 210, 85 S. Ct. 824, 13 L. Ed. 2d 759. The Court

ruled however, that Swain had not established unconstitutional discrimination. In other words, a prosecutor could

permissibly strike a prospective juror for any reason, including the assumption or belief that a black prospective juror,

because of race, would be favorable to a black defendant or unfavorable to the State. See id., at 220-221, 85 S. Ct. 824,

13 L. Ed. 2d 759.

Twenty-one years later, in its 1986 decision in Batson, the Court revisited several critical aspects of Swain, and in essence, overruled them, (because they were racist and discriminatory in the first place). In so doing, the Batson Court emphasized that "the central concern" of the Fourteenth Amendment "was to put an end to GOVERNMENTAL DISCRIMINATION ON ACCOUNT OF RACE." 476 U.S., at 85, 106 S. Ct. 1712, 90 L. Ed. 2d 69. The Supreme Court stated that the principle announced in _Strauder v. West Virginia_, 100 US 303, 25 L Ed. 664, that a State denies a black defendant equal protection when it puts him on trial before a jury from which members of his race have been purposefully excluded, was reaffirmed. The Equal Protection Clause guarantees the defendant that the State will not exclude members of his race from the jury venire, on account of race, or on the false assumption that members of his race as a group, are not qualified to serve as jurors. By denying a person's participation in jury service on account of his "race," the State also unconstitutionally discriminated against the excluded juror. Moreover, selection procedures that purposefully excluded black persons from jury selection, undermine public confidence in the fairness of our justice system. The same equal protection principles as are applied to determine whether there is discrimination in selecting the venire, also govern the State's use of peremptory challenges to strike individual jurors from the petit jury.

In this instant case, the undersigned was not at all, afforded an opportunity to have ANY African-American on his jury, because there were NONE on the jury to choose from. Batson states that in order to establish a prima facie case of purposeful discrimination in the selection of the jury venire, criminal defendants initially must show they are members of a racial group that is capable of being singled out for differential treatment; in combination with that evidence, defendants may then make a prima facie case by proving that in the particular jurisdiction in question, members of their race have not been summoned for jury service over an extended period of time; a prima facie case may also be found on proof that members of the defendant's race were substantially underrepresented on the venire from the defendant's jury was drawn, and that the venire was selected under a practice providing the opportunity for discrimination. The court in Batson stated that a consistent pattern of official racial discrimination, is not a necessary predicate to a violation of the equal protection clause of the Fourteenth Amendment; a single invidiously discriminatory governmental act, is not immunized by the absence of such discrimination in the making of other comparable decisions.

After seeing that there were NO AFRICAN-AMERICANS in the jury pool, the undersigned brought this to the attention of Judge Leslie Kobayashi (hereinafter "Kobayashi") and the undersigned objected, based on the ruling in Batson. Kobayashi's stated reasoning was: "there are not a lot of African-Americans and Hispanics in Hawaii" and that was why there were no African-American or Hispanics that were on the jury pool to choose from. She then stated that the "undersigned's Batson objection was noted," she ignored the undersigned's objections, she then proceeded on with the venire questioning.  Kobayashi did not make any effort to place a resolution to the perceived biased against the undersigned.

The jury pool was to reflect the community in which the defendant is to be tried. The community in Hawaii is not devoid of **ANY AFRICAN AMERICANS.** Yet, not ONE was summoned for jury duty, to afford the undersigned's EQUAL PROTECTION UNDER THE LAW, and to not have members of his race **EXCLUDED** from the jury selection process.

## IV.   CONTINUING TRIAL EIGHT TIMES OVER OBJECTION OF PETITIONER WAS A CONSTITUTIONAL SPEEDY TRIAL VIOLATION

The constitution guarantees all criminal defendants a right to a speedy trial. On February 17, 2017, Williams was indicted on federal mail and wire fraud charges in the District of Hawaii. Upon being transported to the Federal Detention Center in Honolulu, Hawaii, Williams asserted his right to a speedy trial which was set to commence on September 29, 2017. However, the government asked for an extension until October 28, 2017. Williams objected stating that he was ready to go to trial. Over Williams objection, Judge Kobayashi continued the trial. At the next hearing the government asked for another extension arguing that the case was a complex case and had thousands of pages of discovery. Williams objected again and stated he was ready for trial because he was innocent. Judge Kobayashi again continued the trial. The government then filed a motion to have Williams mentally evaluated in which Williams argued was a tactic used by the prosecution in order to extended the trial date. Williams argued that the State Attorneys in Florida tried the same tactic to continue his trial and Williams was evaluated by Dr. Michel Brannon who stated Williams was very competent and a brilliant man. Williams offered this evaluation as proof he didn't need another bogus

evaluation. However, judge Kobayashi granted the government's motion and extended the trial to have Williams mentally evaluated. Needless to say, Williams was again was found highly competent to proceed to trial. The government asked for another continuance right when the time was about to expire and filed a superseding indictment, adding Williams' 73 year-old mother, as a co- defendant. In total, the government's continuance in Williams' trial, was eight (8) times over his objections and Williams sat in jail for three (3) years awaiting trial from his indictment in February 17, 2017 to February 3, 2020, when the trial commenced and then another seven (7) months before he was sentenced. Williams subsequently filed a Motion to Dismiss, based on Speedy Trial Violations and other grounds. The law is very clear on Speedy Trial violations. In <u>Burkett v. Cunningham</u>, 826 F.2d 1208 (3d Cir. 1987), the court made it clear regarding continuances of trials over 18 months and extended time for sentencing and declared it a violation of the constitutional right to a speedy trial and speedy sentencing. Holding that "[a]lthough the delay . . . violates the Sixth Amendment speedy trial guarantee and by itself justifies discharge, the delay in sentencing also prohibits Burkett from pursuing an appeal in this case . . . we find discharge the appropriate remedy for this due process violation". In <u>State v. Vigil-Giron</u>, 327 P.3d 1129 (N.M. Ct. App. 2014), the court stated that "anxiety, loss of employment, continued inability to find work, and ... public humiliation" suffered by the defendant "are forms of prejudice that the speedy trial right is intended to curtail". The court goes on further to state, ''{19} "The length of delay serves two purposes under the speedy trial analysis." Id. ¶ 20. On the one hand, it triggers an analysis of the speedy trial factors; and on the other hand it is, itself, a speedy trial factor to be weighed in the balance. Id. The speedy trial analysis in the present case was triggered by the passage of thirty-six months from the date that Defendant was indicted to the date of the first evidentiary hearing on her motion to dismiss for a speedy trial violation. The court, having determined that this was a complex case, found that the delay exceeded the speedy trial analysis triggering date of eighteen months by an additional eighteen months. See Garza, 2009–NMSC–038, ¶ 2, 146 N.M. 499, 212 P.3d 387 (stating that the length of delay necessary to trigger the speedy trial inquiry is eighteen months for complex cases). Stated differently, on February 18, 2011, once eighteen months had passed from the date Defendant was indicted, the delay in bringing her to trial became presumptively prejudicial. See Spearman, 2012–NMSC–023, ¶ 21, 283 P.3d 272 (recognizing that the triggering date preceding

146 N.M. 499, 212 P.3d 387 (same).

Williams was subjected to an excessive delay of over eighteen months after the eighteen month trigger, the same as in State v. Vigil-Giron, supra, none of which could be attributed to him or his actions. Not once did Williams ask for a continuance and was ready for trial, as soon as he was indicted. To prove Williams' point, he was indicted on State charges stemming from the same business and was taken to trial in 6 months in that case, though he was ready in 60 days the state needed more time. The government stated they investigated Williams from 2013 to 2015 and brought an indictment in 2017. There is no reason the government should not have been ready for trial, instead of waiting five to seven years to try Williams for offenses in 2020 he allegedly committed from 2013 to 2015.

## V. THE STRICKING OF ALL OF DEFENDANT'S WITNESSES FROM THE MAINLAND VIOLATED SIXTH AMENDMENT

During the pretrial stage of this case, PAG Williams filed a motion to have subpoenas issued to pertinent witnesses who hand first-hand knowledge of PAG Williams' business practices and that there was nothing fraudulent about his business operation. A hearing was set to establish whether these witnesses were relevant to PAG Williams' defense. Judge Kobayashi required PAG Williams to give reasons why the subpoenas should be issued for each witness. PAG Williams gave an explanation to each witness and their importance to his defense. Judge Kobayashi was satisfied with all the reasons and had the subpoenas issued. Some of the subpoenas were for heads of different governmental agencies who had scrutinized PAG Williams' business documents. Judge Kobayashi determined that there was nothing fraudulent about the program and his documents approved for filing. However, a week into the trial, after the government's case was breaking down by PAG Williams exposing the government's witnesses as lying under oath, Kobayashi held a hearing after day 5 of trial and stated she was "going to reconsider whether the witnesses from the mainland would be allowed to testify." Kobayashi's reasoning was, "if they did not live in Hawaii, they are not going to be allowed to testify." **(See Exhibit 6- Trial Transcript Day 5 Motion To Quash, pg. 36 Lines 8-25, pg. 37 Lines 1-8; pg. 39 Lines 18-25, pg. 40 Lines 1-12). ).** PAG Williams strongly objected and stated at the hearing that "Kobayashi was violating his constitutional rights." The striking of all the witnesses from the mainland was "extremely prejudicial," as PAG Williams

argued noting that Kobayashi allowed the government to call their own witnesses from the mainland who, did not live in Hawaii to testify against him, but denied PAG Williams the right to call his own witnesses from the mainland to rebut the government's witnesses.

   Dr. Leonard G. Horowitz was submitted as an expert witness and provided his exceptional Professional and Educational credentials, which were accepted by Judge Kobayashi, initially.  However, Kobayashi changed her mind in the middle of trial and struck Dr. Horowitz as an "expert witness," and only said he could only testify as a "lay witness." The court did not apply the Burnet analysis before striking any of the witnesses. By striking these witnesses in the middle of trial, without notice or no justifiable or lawful reasons, had considerably handicapped the petitioner's defense. Evidence that would have been able to be submitted into evidence through these witnesses, were not allowed to be submitted to the jury, because these witnesses were unlawfully stricken. **Burnet v. Spokane Ambulance, 131 Wn.2d 484, 933 P.2d 1036 (1997).**

## VI. INEFFECTIVE ASSISTANCE OF APPEAL COUNSEL

   Every defendant is entitled to effective assistance of counsel. This presumption is not limited to trial counsel. It applies to postconviction and appellate counsel as well. See *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000) (applying the Strickland analysis to a claim of ineffective assistance of counsel on direct appeal); *United States v. Cook*, 45 F.3d 388, 392 (10th Cir. 1995); see generally Lissa Griffin, The Right to Effective Assistance of Appellate Counsel, 97 W. Va. L. Rev. 1 (1994). Consequently, a motion for a new trial under § 974.06 based on ineffective assistance of postconviction counsel must lay out the traditional elements of deficient performance and prejudice to the defense.

   After Williams was convicted at trial, he filed a timely Notice of Appeal. The Ninth Circuit ruled that they did not allow pro se appeals, and therefore, appointed Deanna S. Dotson, (herein after "Dotson"), as Williams' appeal attorney. Williams spoke with Dotson via telephone and mail correspondence and expressed to Dotson that there were at least 8 grounds that he wanted to address in his appeal that all had merits.  After explaining to Dotson the grounds and the circumstances that transpired pretrial and during trial, Dotson agreed that "the grounds were great grounds for appeal."

However, the next time Williams spoke with Dotson, her whole demeanor had changed and she stated that the only grounds she would file would be juror bias and voir dire that there were no blacks on the jury pool. Williams wrote Dotson a letter expressing this was unacceptable and that if she did not file on the grounds of Selective Prosecution, Double Jeopardy, Speedy Trial Violation, Judicial Bias and a few other grounds, that she needed to recuse herself from this case so Williams could be appointed another attorney who would file on those grounds. This letter was sent by certified mail to Dotson. (**See Exhibit 14**).  However, Dotson did not file her recusal letter and filed the appeal without the grounds Williams enumerated in his letter. The selective prosecution ground, which probably was the strongest ground for an appeal, was ignored by Dotson presumably, because she is of the same race as the prosecutors, and she did not think it was against the law for prosecutors to fail to prosecute similarly situated subjects who were white like the prosecutors, working at the same office as Williams, and engaged in the same conduct he was indicted for.

Williams previously filed a pretrial motion to the Ninth Circuit entitled: "Writ for the Court to Exercise Its Supervisory Powers," to dismiss the indictment for these same grounds. The Ninth Circuit declined making a ruling stating that "all the grounds are appealable issues that can be brought up and argued on appeal." Therefore, Dotson's failure to raise these pertinent grounds after she was told to do so, or recuse herself from the case, caused an immeasurable harm to Williams in that he lost his appeal, and now have to seek remedy through this motion. Dotson's representation was grossly ineffective and negligent, in that she should have withdrawn, if she did not want to abide by Williams' decision to either file those grounds or file a motion to withdraw, so that Williams could have been appointed another attorney that would have filed on those appealable grounds. In _Roe v. Flores-Ortega_, 528 U.S. 470 (2000) the court stated, ''Counsel has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or that this particular defendant reasonably demonstrated to counsel that he was interested in appealing. In _Milton v. Miller_, 744 F.3d 660 (10th Cir. 2014) the state court applied the incorrect standard in evaluating petitioner's claim that his appellate counsel provided ineffective assistance of counsel. The key ingredient of this claim

focuses on the appellate issue that was omitted, but which had merit. The state court in this case erroneously held that this fact, alone, is not sufficient to merit relief.

The fact that petitioner was tried and convicted previously by the State of Florida for the same business conduct was clearly a violation of the Double Jeopardy principle outlined in the Fifth Amendment to the U. S. Constitution. In _Jackson v. Leonardo_, 162 F.3d 81 (2d Cir. 1998) the court ruled, ''Petitioner's appellate counsel was ineffective in failing to raise a double jeopardy argument on appeal, challenging his conviction on two counts that could not be prosecuted separately without violating the double jeopardy clause. Petitioner outlined those claims to Dotson, who disregarded the merits of those claims and failed to include those grounds in the appeal she filed. An attorney's failure to file a notice of appeal, despite the wishes of the defendant, amounts to ineffective assistance of counsel, regardless of the merits of the appeal. _Ludwig v. United States_, 162 F.3d 456 (6th Cir. 1998).

## VII. JUDGE KOBAYASHI ERRED IN NOT RECUSING HERSELF WHEN HER IMPARTIALITY WAS QUESTIONED

When a judge's impartiality can be questioned, the judge has a duty to recuse themselves and the case assigned to another judge. Williams on multiple occasions, filed a Motion to Recuse, pursuant to  28 U.S.C. § 144 and 28 U. S. Code § 455 with the appropriate affidavit, outlining the facts and reasons why Kobayashi should recuse herself. In Williams motion, he outlined that Kobayashi was the assigned judge who presided over the lawsuit Williams filed against the FBI and two of their agents, Megan Crawley and Joseph Lavelle, in August 2016.  Williams intentionally filed the lawsuit in Washington, D. C. in order to obtain an "unbiased judge," to weigh the merits of the suit. The judge agreed that "Williams' lawsuit had merits, however, it was filed in the wrong district." Therefore, the case was transferred to Hawaii, where it was assigned to Kobayashi. Kobayashi dismissed the suit stating, "it had no merit."

Six (6) months after Williams filed his suit, the two FBI Agents, Crawley and Lavelle, had federal charges filed against Williams. When Williams was indicted and his case was assigned to Kobayashi, he immediately filed a motion for Kobayashi to recuse herself.  In addition to this case, Kobayashi also presided over a foreclosure case of one of the

government's witness against Williams, whom Williams assisted in fighting their foreclosure and filed a suit against Deutsche Bank. Kobayashi dismissed this lawsuit, as well, without considering the facts that Williams outlined in the civil suit. Based on these two previous experiences with Kobayashi, Williams had no confidence that Kobayashi could be fair and impartial and subsequently filed a proper motion for her to be recused.

## VIII. DENIAL OF PERTINENT EVIDENCE TO PROVE INNOCENCE

Petitioner has a divine and constitutional right to present evidence that proved his innocence. This evidence can be in the form of video, audio, paper documents or eyewitnesses. In the Federal Trial commenced against petitioner, he was unlawfully denied the right to introduce video, audio, paper documents and eyewitnesses, that would have proven his innocence and shown that his conduct was according to the law and approved by several governmental agencies. At trial, the prosecution argued that petitioner's documents were fraudulent, his Private Attorney General ID was fake and he was holding himself out as an attorney at law. However, petitioner presented the evidence that was in the government's discovered documents to the contrary. When petitioner expressed that the evidence that the government had in their possession was evidence he wanted presented to the jury, however, these evidence were denied by Kobayashi, "as being irrelevant or that it would be prejudicial against the government." The evidence that the government alleged was fraudulent by the petitioner, petitioner had extensive physical evidence to the contrary, and to prove the government they intentionally lied and made false and fabricated statements in their indictment and their case to the grand jury and the petit jury. The mortgage documents that petitioner had filed to protect his clients from foreclosure which the government alleged was fraudulent, petitioner had video evidence and documented evidence of their previous approval by the government, after they scrutinized petitioner's company and his documents that these were all valid. Petitioner moved to have this evidence presented to the jury and was denied by Kobayashi.


## IX. JUDICIAL BIAS

In the administration of justice, all parties are entitled to have their case presided over by a fair and impartial adjudicator. The jury should not be given an impression that the judge favors one party over another because such

impression could prejudice the jury to the detriment of one party and advantage to another. Judicial bias "is a structural error" that, if found on habeas, "requires automatic reversal". _Maurino v. Johnson_, 210 F.3d 638 (6th Cir. 2000)

Because judicial bias infects the entire trial process, it is not subject to harmless error review. See _Chapman v. California,_ 386 U.S. 18, 23 n. 8, 87 S.Ct. 824, 827-28 n. 8, 17 L.Ed.2d 705 (1966) (stating that the right against coerced confession, the right to counsel and the right to an impartial judge were examples of constitutional rights "so basic to a fair trial that their infraction can never be treated as harmless error."). Instead, the court is required to assess whether the actions of the judge rose to the level of judicial bias. If the court determines that the actions resulted in a constitutional violation, then the court is required to overturn the state court decision. In reviewing claims of judicial bias, this court is guided by the decision in _Liteky v. United States_, 510 U.S. 540, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994).

In this case, Judge Kobayashi on numerous occasions, acted in such a manner that would give the jury or any lay person the impression that she was bias and favors the prosecution. The most egregious occurrence was an exchange during trial between the prosecutor, Gregg Paris Yates and Kobayashi, when she "coached" Yates to object to what the petitioner was saying. The exchange went thusly:

**DEFENDANT**: Q Okay.  If you was to look at the lawsuit, the lawsuit was about --
**THE COURT**: No, no.  Do you have any objection to this?  Isn't this far afield, Mr. --

**MR. YATES**:  Yes, yes, Your Honor.
**THE COURT**: _" I mean, I don't want to earn your paycheck for you."_
**MR. YATES**:  I apologize, Your Honor.  Out of scope and improper hypothetical.
**THE COURT**:  All right.  Sustained. So, you need to ask her questions in the area that
Mr. Yates asked her questions in about what you have to be to be licensed, how she keeps the database.  We're going kind of far afield here. **(See Exhibit 13 - Jury Trial Day 7, pg. 113 Lines 7-20)**

It is unimaginable that a judge in a criminal case is "coaching a prosecutor," who is supposed to be trained in law on how to object to a line of questioning by a _Pro Se_ defendant, who is devoid of a law school education. This exchange in front of the jury, clearly was biased against the petitioner and extremely prejudicial, and no jury could witness that exchange and not have the impression that the judge favors the prosecution over the defense. This one display was so egregious and prejudicial, that it requires reversal of the conviction.

## X. MENTIONING OF PREVIOUS ARREST AND CONVICTIONS IN FLORIDA IN THE OPENING STATEMENTS AND DURING TRIAL, PREJUDICED THE JURY AGAINST PETITIONER

It is a well-established law that the government can use prior arrests or convictions to impeach a witness or against a defendant who testifies at trial. However, the government cannot use prior convictions to infer that previous acts are indicative of future acts. Before the trial began, the court had a discussion with both the prosecution and the defense, that the arrest and conviction in Florida could NOT be mentioned at trial in front of the jury. However, the government in their opening statement[2] did just that. This caused immeasurable harm and prejudice to the petitioner that could not be overcome by any evidence presented during the entire trial. The jury's minds had already been "corrupted" into believing that "the petitioner was already arrested for this in Florida, therefore, he must also be guilty here in Hawaii." In order to try and overcome this, petitioner asked FBI Special Agent Joseph Lavelle, if there were any federal charges filed against petitioner in other states.  Lavelle answered, "No federal charges were ever filed in any other states" and that the Miami US Attorneys Office "declined prosecution against petitioner for the same charges, which the petitioner was eventually charged with in Hawaii."  Had there been no discussions about other charges, petitioner was confident that his questioning "neutralized" the government's attempt to "poison the minds of the jury." However, on redirect, the prosecutor, Kenneth M. Sorenson, asked Lavelle about state charges. **(See Exhibit 8 - Trial Transcript Day 3, pgs. 185 - 190)**.

Petitioner objected, which was overruled by Kobayashi, who stated: "petitioner opened the door," but petitioner is not the one who "opened the door," the government did it intentionally and unlawfully, in their opening statement [2]. **(See Exhibit 9 - Trial Transcript Day 4, pg. 8)**. Sorenson was allowed to continue this line of questioning and was determined to let the jury know that "petitioner was convicted in Florida," regarding the same business to counteract question by petitioner that Lavelle testified that "No federal charges had ever been filed against petitioner for the same conduct in other states." After Sorenson redirected and questioned Lavelle, Lavelle offered testimony that was false, and testified of things in the Florida trial that he had no knowledge of. After Lavelle's testimony, petitioner asked for a hearing to discuss why the government was allowed to bring in the Florida conviction, which was not relevant to the case nor charges. The issue was discussed and petitioner contended that since the government's witness, Special Agent Lavelle, testified about what was said and done in the Florida trial, the petitioner wanted those portions of the trial

transcripts to be introduced into evidence to show the jury, that Agent Lavelle lied on the stand. Kobayashi denied petitioner's request and forbade the Florida trial transcripts to be introduced into evidence, which would have proven Agent Lavelle lied under oath, and petitioner was telling the truth. **(See Exhibit 10 - Trial Transcript Day 3 pgs. 151 - 154; pgs. 192-194).** Merely questioning the Agent and him not recalling, could not nullify this prejudicial affect his testimony had upon the jury.

[2] Sorenson in his opening statement stated,'' Now, the government will be presenting its case-in-chief through the testimony of witnesses and through evidence. This morning I will summarize at a high level the evidence that the government will present to you over the course of its case-in-chief. I will then walk you through some of the elements -- or rather the elements of the counts that the government has charged in its superseding indictment. Let's talk about the evidence first. First, the government is going to call some law enforcement agent witnesses. You will first hear from Special Agent Megan Crawley who's seated at counsel's table. Special Agent Crawley was the case agent for the FBI's investigation into Anthony Williams's conduct in the District of Hawaii. Agent Crawley will testify to her investigation efforts, provide you with an overview, and then we'll walk you through some of the documents that she obtained as part of her investigation. **You will then hear from Special Agent Joseph Lavelle, an FBI agent based in Miami, Florida. Agent Lavelle will testify regarding circumstances of Anthony Williams's arrest in Florida.**

It was impossible for the jury to set aside the convictions and judge petitioner on the merits of this case. After this exchange, petitioner questioned Agent Lavelle, "had any clients in any states ever made a complaint against petitioner that petitioner scammed, defrauded or committed fraud against them and Agent Lavelle answered, "No", **(See Exhibit 11 - Trial Transcript Day 3 pgs. 171-175).** Yet, Lavelle testified at another time that two clients made a complaint against petitioner.

In *State v. McNallie*, 64 Wn. App. 101 (Wash. Ct. App. 1992), the court ruled that the 1977 conviction would not otherwise be admissible at trial. It is plainly prejudicial to the defendant to have the jury advised of his conviction of the prior crime. The court and counsel commendably resolved the dilemma by stipulation that the conviction would not be communicated to the jury but that the defendant, if found guilty, would be sentenced for a felony and not a gross misdemeanor. It would seem desirable, however, to specifically remove the conviction as an element of the offense to be proved to the jury and make it solely a sentencing factor. The appellate court in Ohio also ruled that a prior conviction mentioned in front of a jury is prejudicial when it stated, ""*The Ohio rule requiring the jury to determine the issue of a prior conviction is prejudicial to the defendant.* A fairer procedure would be to submit the evidence on the issue of a prior conviction to the same jury or, better, to the court after the verdict on the current charge. Usually it is a matter of law and relates to the punishment." *State v. Gordon*, 26 Ohio App. 2d 270 (Ohio Ct. App. 1971).

There was no probative value of bringing up petitioner's prior conviction in the government's opening statement that outweighed the prejudicial effect to the petitioner. From the opening statements, the jury already had it implanted in their minds "petitioner is a criminal and convicted felon and therefore is already guilty of the instant offense." The disclosure of petitioner's prior conviction, was no doubt, one of the main reasons why one of the jurors stated, "she felt petitioner was already guilty," without hearing the case or hearing the petitioner's defense. (**See Exhibit 12 - Trial Transcript Day 2, pg. 167-182**). The court in <u>*State v. Buhl*</u>, 520 N.W.2d 177 (Minn. Ct. App. 1994), agrees with petitioner when it stated, "We also conclude that the prejudicial effect of this evidence outweighed its probative value. See Norris, 428 N.W.2d at 69 (probative value of Spreigl evidence must outweigh its prejudicial effect). Because the prior crime is substantially dissimilar to the present one, the probative value of the prior crime evidence is minimal. The manner in which the evidence was presented further weakened the probative value of this evidence. The prosecutor informed the jury that Buhl had a prior conviction for burglary but she gave the jury no other details of the prior crime. The jury thus was left with the knowledge of Buhl's prior conviction but without any details from which the jury could compare the two crimes to determine whether they were similar and, therefore, whether that conviction advanced the state's charge that Buhl committed the present crime. *This manner of presenting the prior conviction evidence was highly prejudicial because it minimized any probative value of the evidence without giving the jury a chance to judge its applicability.* (**See Exhibit 8 - Trial Transcript Day 3, pgs. 185 - 190 - Sorenson disclosing the Florida conviction.**

## SUMMARY

PAG Williams has presented compelling evidence that the government singled him out for prosecution because of his race and refused to prosecute similarly situated individuals who were of the race or nationality of the judge, the prosecutors and the FBI agents. In addition to selective prosecution, the petitioner had been subjected to Double Jeopardy in violation of the Fifth Amendment by the government, filing charges that the petitioner had previously been tried and unlawfully convicted of, in Florida and sanctioned civilly for the same conduct in Hawaii. As outlined in Helvering, Supra and Green, Supra, the Double Jeopardy principle, protects against prosecution after acquittal, after

conviction and multiple punishments for the same offense. The petitioner has been subjected to being repeatedly punished for the same actions which violated the bedrock double jeopardy principle of finality.

Equal justice under law, requires a criminal trial free of racial discrimination in the jury selection process. Enforcing that constitutional principle, Batson ended the widespread practice in which prosecutors could (and often would), routinely strike, all black prospective jurors in cases involving black defendants. By taking steps to eradicate racial discrimination from the jury selection process, Batson sought to protect the rights of defendants and jurors, and to enhance public confidence in the fairness of the criminal justice system. Batson immediately revolutionized the jury selection process that takes place every day in federal and state criminal courtrooms throughout the United States. _Flowers v. Mississippi_, 588 US___, 139 S. Ct.___,204 L. Ed. 2d 638, 2019 US LEXIS 4196 (2019)

In the decades since Batson, the U.S. Supreme Court cases have rigorously enforced and reinforced these decisions to guard against any backsliding. See Foster, 578 U.S. ___, 136 S. Ct. 1737, 195 L. Ed. 2d 1; _Snyder v. Louisiana_, 552 U.S. 472, 128 S. Ct. 1203, 170 L. Ed. 2d 175 (2008); _Miller-El v. Dretke_, 545 U.S. 231, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005)(Miller-El II). Moreover, the Court has extended Batson in certain ways. A defendant of any race may raise a Batson claim, and a defendant may raise a Batson claim, even if the defendant and the excluded juror are of different races. See _Hernandez_, 347 U.S., at 477-478, 74 S.Ct. 667, 98 L. Ed. 866; _Powers_, 499 U.S., at 406, 111 S. Ct. 1364, 113 L.Ed. 2d 411. Moreover, Batson now applies to gender discrimination, to a criminal defendant's peremptory strikes, and to civil cases. See _J.E.B. v. Alabama ex rel._ T.B., 511 U.S. 127, 129, 114 S. Ct. 1419, 128 L. Ed. 2d 89(1994); _Georgia v. McCollum,_ 505 U.S. 42, 59, 112 S. Ct. 2348, 120 L. Ed. 2d 33 (1992); _Edmonson v. Leesville Concrete Co_., 500 U.S. 614, 616, 111 S. Ct. 2077, 114 L. Ed. 2d 660 (1991).

A state's purposeful or deliberate denial to blacks on account of race of participation as jurors in the administration of justice, violates the equal protection clause of the Fourteenth Amendment. Total or seriously disproportionate exclusion of blacks from jury venires, is itself such an unequal application of the law, as to show intentional discrimination.

In this instant case, the petitioner did not have ANY AFRICAN AMERICANS to choose from the jury pool and thus, his rights were violated, to equal protection, under the law. There are African-Americans living in Hawaii, yet there was not a SINGLE AFRICAN AMERICAN summoned to have the opportunity to sit as a juror, in the petitioner's case. When the right to an impartial jury has been violated, no inquiry as to the sufficiency of the evidence to show guilt is indulged and a conviction by a jury so selected MUST BE SET ASIDE. *People v. Mitcham,* 1 Cal. 4th 1027, 5 Cal. Rptr. 2d 230, 824 P. 2d 1277, 1992 Cal. LEXIS 1269 (1992).

## CONCLUSION

Based upon the foregoing facts the petitioner's conviction must be overturned and vacated.

Executed this 17ᵗʰ day of April, 2023

Righteously submitted,


Anthony T. Williams,
Private Attorney General (Frankenhauser v. Rizzo, 59 F. R. D. 339, (E. D.  Pa. 1973))
Counsel to the Poor (Psa. 14:6)
Common Law Counsel (28 USC 1654, First Judiciary Act of 1789, § 35)

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was furnished by US Mail to the following recipient(s):

On the 17th day of April, 2023.


United States District Court
State of Hawaii
Prince Kuhio Federal Bldg.
U,S. Attorneys Office
Kenneth Sorenson
Gregg P. Yates
300 Ala Moana Blvd., Room 6-100
Honolulu, Hawaii  96850




_Anthony T. Williams_

Anthony T. Williams,
Private Attorney General (Frankenhauser v. Rizzo, 59 F. R. D. 339, (E. D.  Pa. 1973))
Counsel to the Poor (Psa. 14:6)
Common Law Counsel (28 USC 1654, First Judiciary Act of 1789, § 35)


"For I know how many are your offenses and how great your sins.  You oppress the righteous and take bribes and you deprive the poor of justice in the courts."

Amos 5:12