**EXHIBIT 1**

1    questions.

2              After your investigation, other than these federal

3    charges in Hawaii, have any of your agencies in any other state

4    filed any federal charges against me for my conduct or my

5    business conduct?

6        A    No, sir.

7        Q    And did the FBI investigate, charge, or arrest any

8    of my white employees in the state of New York?

9        A    State of New York, no, sir.

10       Q    Did they investigate, charge, or arrest any of my

11   agent employees in New York?

12       A    No, sir.

13             MR. SORENSON:  Your Honor, I'm going to object as

14   this being beyond the scope.  We were not talking about other

15   employees of his.  I think it was narrowed now to just him

16   and --

17             THE COURT:  All right.  Overruled.  Go ahead.

18       Q    (BY  DEFENDANT WILLIAMS:)  Did the FBI investigate,

19   charge, or arrest any of my white employees in Arkansas?

20       A    No, sir.

21       Q    Did they investigate, charge, or arrest any of my

22   agent employees in Arkansas?

23       A    No, sir.

24       Q    Did they investigate, arrest, or charge any of my

25   Caucasian or Asian employees in California?


                    UNITED STATES DISTRICT COURT

1    A    No, sir.

2    Q    Did they investigate, charge, or arrest any of my

3 Asian or Caucasian employees in Illinois?

4    A    No.

5    Q    Did they investigate, charge, or arrest any of my

6 employees in the state of Florida?

7    A    Well, the term "employee," there was Mr. William

8 Hatchett.  Whether or not he was an employee of MEI --

9    Q    He's not Caucasian.

10   A    Oh, Caucasian.  So, yes, sir, correct.

11   Q    All right.  So did you all investigate, charge, or

12 arrest any of my Caucasian employees in Florida?

13   A    Investigate, yes, sir.

14   Q    And who was that?

15   A    But charge, no.

16   Q    And who was that?

17   A    Ms. Donna Hickenbottom.

18   Q    Again, you investigated her, but you never charged

19 her?

20   A    Yes, sir.

21   Q    And did you investigate, charge, or arrest any of my

22 Caucasian or Asian employees in North Carolina?

23   A    No, sir.

24   Q    Okay.  Did the FBI file any charges against me for

25 bank fraud?


UNITED STATES DISTRICT COURT

**EXHIBIT 2**

1       A       A sovereign citizen which is it falls within the

2    FBI.  Our policy dictates that sovereign citizens fall under a

3    domestic terrorism policy, basically guidance.

4       Q       And so what made you feel like I'm a terrorist?

5       A       Well, I don't feel like you're a terrorist.  I mean,

6    it -- if you're asking me what actions you made that concerned

7    myself and the FBI --

8               MR. SORENSON:  Your Honor, I would object on

9    relevance grounds.

10              THE COURT:  All right.  Overruled.

11         Continue with your answer.

12              THE WITNESS:  You made -- I guess I would say you

13   made basically threats along the lines of common law and

14   sovereign that if a law enforcement officer were to take action

15   against yourself or others that you didn't deem necessary or

16   were warrantless, that you would have the right to take that

17   law enforcement officer's life or basically deadly force.

18      Q       (BY THE DEFENDANT:)  And did I send that letter

19   certified to one of the law enforcement agencies?

20      A       I don't know what letter you're referring to.

21      Q       So how did you get that -- where do you get that

22   assertion from?

23      A       You made that statement specifically in Ventura,

24   California, to a group of foreclosure homeowners.

25      Q       And would that be considered terroristic threat?


UNITED STATES DISTRICT COURT

1       A      It -- it concerned the FBI and our department

2   basically.  It was -- we did not view it as a terroristic

3   threat.  It was basically an if/then sort of situation:  If

4   this happens, then I will take action.  So it was not a direct

5   terroristic threat, no, sir.

6       Q      Okay.  So is me as a regular citizen and you as a

7   law enforcement officer --

8       A      Uh-huh.

9       Q      -- if we had an encounter on the street, right, and

10  you violated my right and say you assaulted me illegally

11  unlawfully, didn't have no right to arrest me or no right to

12  detain me, so are you saying I don't have a right to defend

13  myself against you even up to the point of taking your life if

14  you assault me?

15      A      Mr. Williams, I don't know.  I don't deal in

16  hypothetical situations.  If a law enforcement officer were to

17  take action to arrest you and you didn't deem it necessary, you

18  do not have the right to take that law enforcement officer's

19  life.

20      Q      And what law are you basing that on?

21      A      Of what -- murder?

22      Q      That wouldn't be murder.  I'm saying what law are

23  you basing that on?

24      A      I don't understand your question, sir.

25      Q      The Supreme Court case --

UNITED STATES DISTRICT COURT

1          MR. SORENSON:  Your Honor, I'm going to object

2     again.  I just think we're getting very far afield here.

3          THE COURT:  Okay.  So how is this related to what

4     he's testified about that you made a statement to the group of

5     homeowners in Ventura, California, which is what started their

6     investigation of you?

7          THE DEFENDANT:  Right, 'cause he's saying that based

8     on a statement that I made to a group of people at my

9     seminar --

10          THE COURT:  Yeah.

11          THE DEFENDANT:  -- they deemed me a terrorist.

12          THE COURT:  Right.  So, okay.  So -- but that's not

13     what's before us.  So if you want to ask him anything that he

14     did in the investigation of you, you can do that.  But I think

15     we're going far afield if we're talking about to what extent

16     people can avail themselves in raising self-defense.  Does that

17     make sense?

18          So you can ask him what he did, what he knows, et cetera,

19     with regard to you.

20     Q     (BY THE DEFENDANT:)  Okay.  So because I made that

21     statement, that somehow put me under your all radar --

22     A     Yes, sir.

23     Q     -- that I'm a violent man?

24     A     Your criminal history indicated some degree of

25     concern for us and specifically with traffic violations and

1    traffic stops with local police officers as far as resisting

2    arrest.  So, I mean, there are varying degrees of violence, but

3    you definitely concerned us, sir.

4         Q    So you're saying that in my history, I have a

5    criminal history that is violent toward police officers?

6         A    You were booked, I believe, several times in your

7    history for resisting officers.

8         Q    With violence?

9         A    I believe -- I don't have your criminal history in

10   front of me, but I believe several of them were without

11   violence.  They were resisting without violence.

12        Q    Okay.  So I've protested, but it wasn't with

13   violence?

14        A    Yes, sir.

15        Q    So it was without violence?

16        A    Yes, sir.

17        Q    So there's nothing in my history that says I'm a

18   violent person?

19        A    Yes, sir.

20        Q    So -- 'cause you have access to my FBI file,

21   correct?

22        A    Your criminal history, yes, sir.

23        Q    Okay.  So in my FBI file is there anything that's

24   designated in there that I'm a threat to police officers in

25   the --


UNITED STATES DISTRICT COURT

**EXHIBIT  3**

1          So ask him a question about what he did or didn't do.

2          Q     (BY THE DEFENDANT:)  Okay.  So when you completed

3    your investigation with -- how many other agents did you

4    investigate me with in Florida?

5          A     The other agents -- there was -- I mean, our squad,

6    my squad has approximately seven special agents.  I was the

7    lead case agent for your investigation.

8          Q     And that was for mortgage fraud?

9          A     No.  I was assigned to the domestic terrorism squad

10   at that time, sir.

11         Q     Okay.  So when did -- where did the mortgage fraud

12   come in?

13         A     Well, there was a -- what we call a parallel

14   investigation for mortgage fraud activities that was run of the

15   Miami division's mortgage fraud squad, and my squad tried to

16   focus on if there was any threats of basically force or

17   violence of yourself.

18         Q     So you assessed that I was violent?

19         A     No, sir.

20         Q     So at the conclusion of your investigation, your

21   office declined prosecution, correct?

22         A     Not my office.  The U.S. Attorney's Office, sir.

23         Q     Well, the U.S. Attorney's Office in Florida declined

24   prosecution?

25         A     Yes, sir.

UNITED STATES DISTRICT COURT

1      Q      Okay.  So is he your direct supervisor or he just a

2    supervisor?

3      A      He is a supervisor of the mortgage fraud squad and I

4    was not on that squad.

5      Q      Okay.  And it was his determination --

6             MR. SORENSON:  Objection, Your Honor.  I think he's

7    about to tell what the content of this is.

8             THE DEFENDANT:  No.  I'm asking him a question.

9             THE COURT:  Right, no.  So -- so let me just ask a

10   question.

11        So, Agent Lavelle, are you -- were you involved at all in

12   whatever the subject is of that document?  Did you have input?

13   Did you participate in making --

14            THE WITNESS:  I did not participate in making this

15   document, but the declination of the U.S. Attorney's Office for

16   prosecution was made for a variety of reasons, if that's what

17   we're getting at.

18            THE COURT:  Okay.  So you can ask him -- he

19   obviously knows that the U.S. Attorney's Office for that

20   district for Florida declined prosecution.

21            THE DEFENDANT:  Okay.

22            THE COURT:  So do you want to ask him about that?

23   But this document, he didn't produce it, and, you know, he

24   didn't participate in direct input.  It's a different division.

25            THE DEFENDANT:  Okay.


UNITED STATES DISTRICT COURT

**EXHIBIT 4**

1     the upper counties like West Palm Beach or anything like that?

2         A      My specific office, we may have.  I can't recall --

3     cut leaves which is basically we ask other offices to conduct

4     interviews on our behalf, but I can't recall anything in any

5     other counties within Florida.

6         Q      And you personally interviewed a lot of these

7     clients?

8         A      I did.

9         Q      And do you remember one client named Donna

10    Hickenbottom?

11        A      I do.

12        Q      And what color is she?  What's her nationality?

13        A      She's white.

14        Q      She's white.  And in your investigation, what was

15    her relation toward me and my company?

16        A      She worked for you during a period of time and I

17    believe she was in a relationship with you.

18        Q      So she worked for me.  In your investigation, did

19    you see where she would file some of the documents like in the

20    county and things like that?

21        A      Within the clerk's office, yes, sir.

22        Q      And so you are familiar that before she came to work

23    with me that she was a client?  Are you familiar with that?

24        A      Yes, sir.

25        Q      Okay.  So -- so you're aware that I would go to

UNITED STATES DISTRICT COURT

**EXHIBIT 5**

1   my ID?

2            MR. SORENSON:  Oh.

3            THE COURTROOM MANAGER:  It was 604.

4            MR. SORENSON:  Your Honor, may I approach and hand

5   this --

6            THE COURT:  Yes, you may, the actual badge, yes.

7            MR. SORENSON:  This is, for the record, Exhibit 501,

8   Your Honor.

9            THE COURT:  Thank you.  All right.  Let the record

10  reflect 501 is before the witness.

11       Mr. Williams.

12       **JOSEPH LAVELLE, PREVIOUSLY SWORN, RESUMED THE STAND**

13                      RECROSS-EXAMINATION

14  BY THE DEFENDANT:

15       Q     Yes.  Mr. Lavelle -- Agent Lavelle, do you remember

16  making a statement that I had been convicted of identity theft?

17       A     No, sir.  I believe I said that you were accused.

18  Whether or not you were found guilty, uhm, there were several

19  trials in Broward County, so I believe you were charged with

20  identity theft.  I don't -- I don't recall whether or not you

21  were found guilty.

22       Q     Okay.  'Cause yesterday you had said I was found

23  guilty; that's why I questioned you about it.

24       A     Okay.

25       Q     But I was not.  So I don't have to ask you other

UNITED STATES DISTRICT COURT

1    questions.

2              After your investigation, other than these federal

3    charges in Hawaii, have any of your agencies in any other state

4    filed any federal charges against me for my conduct or my

5    business conduct?

6        A    No, sir.

7        Q    And did the FBI investigate, charge, or arrest any

8    of my white employees in the state of New York?

9        A    State of New York, no, sir.

10       Q    Did they investigate, charge, or arrest any of my

11   agent employees in New York?

12       A    No, sir.

13            MR. SORENSON:  Your Honor, I'm going to object as

14   this being beyond the scope.  We were not talking about other

15   employees of his.  I think it was narrowed now to just him

16   and --

17            THE COURT:  All right.  Overruled.  Go ahead.

18       Q    (BY  DEFENDANT WILLIAMS:)  Did the FBI investigate,

19   charge, or arrest any of my white employees in Arkansas?

20       A    No, sir.

21       Q    Did they investigate, charge, or arrest any of my

22   agent employees in Arkansas?

23       A    No, sir.

24       Q    Did they investigate, arrest, or charge any of my

25   Caucasian or Asian employees in California?

UNITED STATES DISTRICT COURT

1    A    No, sir.

2    Q    Did they investigate, charge, or arrest any of my

3 Asian or Caucasian employees in Illinois?

4    A    No.

5    Q    Did they investigate, charge, or arrest any of my

6 employees in the state of Florida?

7    A    Well, the term "employee," there was Mr. William

8 Hatchett.   Whether or not he was an employee of MEI --

9    Q    He's not Caucasian.

10    A    Oh, Caucasian.   So, yes, sir, correct.

11    Q    All right.   So did you all investigate, charge, or

12 arrest any of my Caucasian employees in Florida?

13    A    Investigate, yes, sir.

14    Q    And who was that?

15    A    But charge, no.

16    Q    And who was that?

17    A    Ms. Donna Hickenbottom.

18    Q    Again, you investigated her, but you never charged

19 her?

20    A    Yes, sir.

21    Q    And did you investigate, charge, or arrest any of my

22 Caucasian or Asian employees in North Carolina?

23    A    No, sir.

24    Q    Okay.   Did the FBI file any charges against me for

25 bank fraud?

UNITED STATES DISTRICT COURT

**EXHIBIT 6**

1      Q      (BY THE DEFENDANT:)  Can you see that document,

2    Ms. Castillo?

3      A      Yes.

4      Q      And are you familiar with this document, the

5    qualified written request, QWR?

6      A      Yeah.

7      Q      Okay.  Is this a normal document that was sent on

8    behalf of clients?

9             MR. YATES:  Objection, Your Honor.  This document's

10   not in evidence.

11            THE COURT:  Right.  I think he's trying to lay the

12   foundation.

13            THE DEFENDANT:  This is the government's exhibit

14   also.  It's not my exhibit.

15            THE COURT:  Yes.  Well, it's an exhibit and so it's

16   not in evidence, so if you can ask her about it.  So she said,

17   "Yeah."  So what's your next question?

18     Q      (BY THE DEFENDANT:)  Okay.  So this is the document

19   that every client would be drafted for to send to the mortgage

20   company or whoever the bank was that did the alleged loan,

21   correct?

22     A      Yes, correct.

23     Q      And do you remember how long it usually took for the

24   bank to respond or if they ever responded to the qualified

25   written request?

1       A       It takes a long time for them to respond or they

2    don't respond at all.

3       Q       Right.  And so if the -- can you turn to page --

4    page 15 of the exhibit?

5               And I'd like to publish so the jury can see it?

6               MR. YATES:  Objection, Your Honor.  It's clear that

7    the defendant is not laying a foundation for this document.

8    He's asking about the substance of it and this document is not

9    in evidence and there's no evidence that Ms. Castillo was

10   involved in the drafting of this document or relied upon it in

11   any way.

12              THE COURT:  All right.  So it's not in evidence, so

13   we can't publish it.

14      Q       (BY THE DEFENDANT:)  Okay.  Ms. Castillo, is the

15   qualified written request -- when you worked with me, did you

16   regularly send this letter out on behalf of clients?

17      A       Yes, with the template, just put their name.

18      Q       Right.  So you sent a lot of qualified written

19   request on behalf of clients, correct?

20              THE COURT:  That's what she just said.  Ask the next

21   question.  What are you trying to do with this document?  You

22   want to receive it into evidence?

23              THE DEFENDANT:  Yes, I want to receive it in

24   evidence.

25              THE COURT:  All right.  So she said she's familiar

1   document, but right now page 15.

2              THE COURT:  So you may publish.  All right.  So

3   page 1 is now before the jury.

4              THE DEFENDANT:  Page 15.

5        Q    (BY THE DEFENDANT:)  Okay.  Ms. Castillo, do you see

6   where it says, "Default provisions under this qualified written

7   request"?

8        A    Yes.

9        Q    And in that default provision, was there a

10  stipulation that if the bank or the mortgage company didn't

11  respond in the allotted time, then that would grant the

12  homeowner the right to rescind the contract and have like a UCC

13  or any type of financing statement or mortgage filed on behalf

14  of the client?

15       A    Can you point out what portion this paper it is?

16       Q    Page -- paragraph No. 4.

17             THE COURT:  There is no paragraph numbered 4 on that

18  page that --

19             THE DEFENDANT:  Well, the next page.

20             THE COURT:  No.  Then you have to point it out to

21  her.

22             THE DEFENDANT:  Page 16, I'm sorry.

23             THE WITNESS:  Page 16?

24             THE DEFENDANT:  Yeah.  Number 4 and number 6.

25             THE WITNESS:  Okay.  Are we looking -- this is


                    UNITED STATES DISTRICT COURT

1    page 14 of 17 that you have.

2              THE DEFENDANT:  Well, here are page 16.  It's

3    paragraph 4 and paragraph 6.

4              THE COURT:  Okay.  If you look at the screen, I

5    believe -- you want her to look at paragraph numbered 4 and 6?

6              THE DEFENDANT:  And 6, right.

7              THE COURT:  Okay.

8              THE WITNESS:  Number 4?

9              THE COURT:  And 6.

10             THE WITNESS:  Number 4 is something to do with

11   filing of UCC.

12       Q    (BY THE DEFENDANT:)  Yes.  Number 4 and number

13   6 -- paragraph 4, yes.  Did you read paragraph 4 and

14   paragraph 6?

15             THE COURT:  Read them to yourself and then he's

16   going to ask you a question.

17             THE WITNESS:  Okay.  I read it.

18       Q    (BY THE DEFENDANT:)  Okay.  So according to the

19   qualified written request, paragraph 4 and 6, does it allow for

20   a UCC financing statement to be filed if the bank did not

21   answer?

22             MR. YATES:  Objection.  Document speaks for itself.

23             THE COURT:  All right.  Overruled.

24             THE WITNESS:  There's --

25             THE COURT:  What's your understanding of 4 and 6,

**EXHIBIT  7**

1    court with her and assist her?

2        A      Yes, sir.

3        Q      In fighting on foreclosures?

4        A      Yes, sir.

5        Q      Okay.  Now, when you interviewed her, did she say

6    that she felt like I defrauded her or was defrauding her

7    or -- when you interviewed her?

8        A      Her interview was a long time ago.  I don't believe

9    she said that she was being defrauded by you because of various

10   reasons.

11       Q      So any of the other homeowners in Florida that you

12   interviewed, did any of them call your office or come by your

13   office and make a complaint against me?

14       A      No, sir.

15       Q      When you visited them, did they make a complaint

16   after you visited them and say, Hey, this guy wronged us; he

17   did something fraudulent, or, He didn't do what he promised he

18   said he was going to do for us?  Did any of them make that

19   statement to you?

20       A      Yes, sir.

21       Q      Which one made that statement to you?

22       A      Hmm, the homeowners that come to mind are Shirley

23   Callington and Consuelo Garcia are the two that come to mind.

24       Q      Them two said I didn't do what I said I was going to

25   do?

UNITED STATES DISTRICT COURT

1    Q    Did Broward initially charge me with unlicensed

2  mortgage broker charge?

3    A    The initial charges, I can't recall.

4    Q    So did the FBI charge me with unlicensed mortgage

5  broker?

6    A    In the Southern District, no, sir.

7    Q    In any district in Florida?

8    A    Not to my recollection, sir.

9    Q    And in your investigation, you -- what would the

10  specific federal charges that you were investigating me for

11  that you felt you had probable cause that my business was

12  committing in Florida?

13    A    The specific charges would have been mail, wire, and

14  mortgage fraud for the Southern District.  Excuse me.

15    Q    So mail, wire, and mortgage fraud.

16    A    Yes, sir.

17    Q    And did you all ever charge me with mail, wire, and

18  mortgage fraud in Florida?

19    A    No, sir.

20    Q    Did you all receive any statements from any clients

21  that was written to your office stating that I committed fraud

22  against them, that I scammed them or defrauded them?

23    A    No, sir.

24    Q    And in your investigation, you found out that I got

25  offices in multiple states, correct?


UNITED STATES DISTRICT COURT

1    A    Yes, sir.

2    Q    And do you know what those states were?

3    A    As specifically off the top of my head, Hawaii,

4  here, and California, and perhaps Tennessee.

5    Q    What about Texas?

6    A    Yes, sir, Texas.

7    Q    Were you one of the agents that searched my mom's

8  home, took her computer, took the files out of her home office?

9    A    I was present, yes, sir.

10   Q    Okay.  So you know I had a office in Texas.  Now, in

11 your investigation in your collaboration with the Texas FBI

12 office, how many clients in Texas filed charges against me, my

13 company, or my mother for fraud?

14   A    I don't recall, sir.

15   Q    You don't recall or you don't recall there's any?

16   A    I don't recall that there's any.

17   Q    In California, were you in contact with the FBI

18 agent or office there?

19   A    Yes, sir, for specifically for the Ventura mortgage

20 event.

21   Q    Okay.  So of all my clients in California that I

22 have, how many clients in California filed any charges against

23 me or made a complaint against me or my company for mortgage

24 fraud or scamming them or anything like that?

25        MR. SORENSON:  Your Honor, I'm going to object

UNITED STATES DISTRICT COURT

1   because he keeps saying how many people filed charges and I

2   think that assumes some kind of legal conclusion.  And it

3   infers that people filed charges.  We just object to the form

4   of the question.

5           THE COURT:  All right.  Overruled.

6       Okay.  If you understand the question, you can answer it.

7           THE WITNESS:  Okay.  No -- no victims in California,

8   to my knowledge and recollection.

9       Q    (BY THE DEFENDANT:)  Okay.  And so you know that

10  upon your investigation, I also have an office in Tennessee,

11  correct?

12      A    Yes, sir.

13      Q    And you know I been -- you know how long I been in

14  Tennessee?  Do you know about the time frame I was in Tennessee

15  before I came to the other states?

16      A    Yes, sir, I was aware of that.

17      Q    Okay.  So you know I was in Tennessee around 2009 --

18  since 2009?

19      A    Perhaps, yes, sir.

20      Q    Okay.  And so you're aware that the FBI office in

21  Nashville also did the same thing that you all did in Florida

22  and had my mortgage company and my common law office under

23  investigation, federal investigation?  You're aware of that

24  too, correct?

25      A    Yes, sir, I was.


UNITED STATES DISTRICT COURT

**EXHIBIT  8**

```
 1              THE COURT:  All right.  Very good.  You got 6 more

 2    minutes.

 3                        REDIRECT EXAMINATION

 4    BY MR. SORENSON:

 5         Q      Special Agent Lavelle, you testified on direct exam

 6    with respect to the idea or concept of other states filing

 7    charges.  Do you remember that?

 8         A      Yes, sir.

 9         Q      I think the question might have been something like,

10    So Hawaii's the only state that's ever filed charges.  Do you

11    remember that question?

12         A      Federal charges, yes, sir.

13         Q      Okay.  Well, you didn't say federal charges at the

14    time.

15         A      I believe the question was federal charges.

16         Q      Okay.  Were there charges filed in any other state?

17         A      Yes, sir.

18         Q      What charges were filed in another state?

19         A      In the state of Florida --

20              THE DEFENDANT:  Objection.  Beyond the scope.

21              THE COURT:  All right.  Overruled.  You asked him

22    about charges filed in other areas, so opened the door.

23         All right.  So the question -- you can finish your answer.

24         Q      (BY MR. SORENSON:)  Do you have personal knowledge

25    of other charges being filed?
```

UNITED STATES DISTRICT COURT

```
 1      A      Yes, sir.

 2      Q      And did you, in fact, testify at a trial where other

 3 charges were litigated?

 4      A      Yes, sir.

 5      Q      And who were those charges filed against?

 6      A      Anthony Troy Williams.

 7      Q      And do you recall what those charges were?

 8      A      They were grand theft and filing false documents and

 9 I believe identity theft.

10      Q      Are you familiar with the circumstances under which

11 the grand theft charges were brought?

12      A      Yes, sir.

13      Q      Were they related to mortgage fraud?

14      A      Yes, sir.

15      Q      Were they related to his -- his mortgage fraud -- or

16 mortgage reduction plan as you've described it?

17      A      Yes, sir.

18      Q      And was it this plan to reduce mortgages by

19 one-half?

20      A      Yes, sir.

21      Q      And -- and -- but in Florida, the state of

22 Florida -- was it Broward County?

23      A      Yes, sir.

24      Q      He was charged with grand theft based on that; is

25 that correct?
```

```
 1      A      Yes, sir.

 2             THE DEFENDANT:  Objection.

 3      Q      (BY MR. SORENSON:)  Did the victims --

 4             THE COURT:  Wait.  I'm sorry.  So your objection is?

 5             THE DEFENDANT:  Improper impeachment by Rule 609.

 6             THE COURT:  All right.  So you opened the door with

 7      regard to charges being brought on the mortgage-related.  So

 8      I'm going to overrule on that basis.

 9      Q      (BY MR. SORENSON:)  Mr. Williams also asked you a

10      lot of questions about people complaining about him; is that

11      correct?

12      A      Yes, he did, sir.

13      Q      And were there homeowners involved with respect to

14      those grand theft charges?

15      A      There were.

16      Q      And did they have complaints?

17      A      They testified about Mr. Williams's activities in

18      mortgage.

19             THE DEFENDANT:  Objection.  Hearsay.

20             THE COURT:  All right.  Overruled.

21       Okay.  Next.

22      Q      (BY MR. SORENSON:)  And did they testify that he had

23      offered them this same scheme to --

24             THE DEFENDANT:  Objection.  That's leading and

25      hearsay.
```

UNITED STATES DISTRICT COURT

1          THE COURT:  Okay.  Sustained.

2     Q     (BY MR. SORENSON:)  What did they testify about?

3     A     They testified about Mr. Williams acting as a

4  private attorney general and being able to reduce their --

5          THE DEFENDANT:  Objection.  Again, hearsay and

6  that's not what they testified.

7          THE COURT:  Okay.  Well, you didn't object to the

8  question.  He already began his answer, so next question.

9     Q     (BY MR. SORENSON:)  Is -- can he finish the answer,

10  Your Honor?

11          THE COURT:  No, 'cause it is hearsay.  So ask him

12  another question.  But his answer to that point will stand.

13     Q     (BY MR. SORENSON:)  Okay.  So -- and you testified

14  in this trial yourself; is that correct?

15     A     I did, sir.

16     Q     And are you familiar with what happened in that

17  trial?

18     A     I am.

19     Q     And what happened?

20     A     Mr. Williams was found guilty.

21     Q     Was Mr. Williams seated here in courtroom -- the

22  courtroom today convicted of grand theft there?

23     A     Yes, he was.

24     Q     All right.  And was he also charged any time in

25  Florida with the unauthorized practice of law?

1      A      He was.

2      Q      And do you know what that was related to?

3      A      It was related to him -- his activities of

4   pretending to be a board certified -- a Florida bar certified

5   attorney.

6      Q      Okay.  And was it in the context of representing

7   people?

8      A      Yes, sir.

9      Q      And was that in court proceedings?

10     A      It was.

11     Q      What types of court proceedings?  Do you know?

12     A      Foreclosure proceedings.

13     Q      Do you know how many counts he was convicted of with

14   the unauthorized practice of law?

15     A      I don't recall.

16            THE DEFENDANT:  Improper 609.

17            THE COURT:  All right.  Overruled.

18     Q      (BY MR. SORENSON:)  Are you familiar with whether he

19   was convicted?

20     A      Sir, there were actually several trials for

21   Mr. Williams.  One trial I believe resulted -- it was a hung

22   jury and then there was a second trial.  So I don't have all

23   those charges.

24     Q      All right.  If you don't know for sure, don't

25   testify to it, okay?


UNITED STATES DISTRICT COURT

```
 1       A      All right.

 2       Q      But was he charged with the unauthorized practice of

 3   law?

 4       A      He was, yes, sir.

 5       Q      And was he convicted of grand theft in Florida?

 6       A      He was.

 7       Q      Was that in Broward County, Florida?

 8       A      It was.

 9       Q      And was that related to a mortgage reduction --

10       A      It was, yes, sir.

11       Q      -- operation?

12       A      Yes, sir.

13              MR. SORENSON:  Thank you, Your Honor.  That's all I

14   have.

15              THE COURT:  All right.  Do you have any other

16   questions?

17              THE DEFENDANT:  Yes.

18              THE COURT:  Okay.  We have literally one minute

19   left.  So I promised them that I would finish by 2:00.

20              THE DEFENDANT:  May I start tomorrow then?

21              THE COURT:  So, well -- so if you can come up to the

22   microphone.  How many -- how much more?  'Cause you --

23              THE DEFENDANT:  It's going to be --

24              THE COURT:  -- would have had the right --

25              THE DEFENDANT:  It's going to be more than one
```

UNITED STATES DISTRICT COURT

**EXHIBIT  9**

1          THE COURT:  Yes.

2          THE DEFENDANT:  -- I questioned him regarding, you

3     know, any federal charges being filed against me, you know, in

4     any states.  When Mr. Sorenson came up, he questioned him on

5     the state charges which is not relevant to any federal charges,

6     and so I feel like it has prejudiced me because now I have

7     to -- if I didn't want to testify, now I have to testify to

8     explain that state charge when I never brought up any state

9     charges and we're not in state court.  We in federal court.  So

10    now I feel like my constitutional rights has been violated

11    because now I'ma have to testify to explain why I was

12    unlawfully, you know, convicted of it.  It's still pending, you

13    know, in the Florida Supreme Court right now.

14          THE COURT:  All right.  So your objection's noted

15    for the record.  I believe you also timely objected during the

16    examination, and the court's ruling was that in asking -- even

17    though you believe that you limited it to the federal charges,

18    you did bring up charges arising out of the same conduct.  So

19    that leads to what's called opening the door to relevant

20    evidence having to do with any charges that may have arisen or

21    been -- or having resulted from that type of conduct.  And

22    that's why I permitted Mr. Sorenson to ask those questions.

23          Whether or not you choose to testify at that point in the

24    trial, I will ask you a series of questions before -- outside

25    the presence of the jury to determine whether you wish to

UNITED STATES DISTRICT COURT

**EXHIBIT 10**

1   going to take a recess and give the government some time to

2   review.

3        What do you think?  10 minutes?

4             MR. SORENSON:  Yes, Your Honor.

5             THE COURT:  All right.  So if you could leave your

6   iPads and notebooks behind.  Of course, don't discuss the case,

7   allow anyone to discuss it with you.  And we will bring you

8   back after they've reviewed for about 10 minutes.

9        Please rise for the jury.  We're in recess.

10            (Open court out of the presence of the jury.)

11            THE COURT:  The record will reflect the jury's no

12  longer present.  Present are counsel and Mr. Williams.

13       Mr. Isaacson, please go to a microphone.

14            MR. ISAACSON:  Sorry, Judge.  I just thought --

15  there was only one copy made?

16            THE COURT:  There are additional copies being made,

17  but we wanted to make one copy right away.

18            MR. ISAACSON:  Oh, okay.

19            THE COURT:  So we're in recess.

20            (A recess was taken.)

21            (Open court out of the presence of the jury.)

22            THE COURT:  All right.  Let the record reflect the

23  jury's not present.  Present are counsel and Mr. Williams.  And

24  I'm sure the witness is somewhere around.

25       But I just want to make sure we all have a copy of the

UNITED STATES DISTRICT COURT

1   transcript which is dated June 23, 2017, and it is in the

2   matter of the State of Florida v. Anthony Williams, case

3   No. 17-00074-CF-10A before Judge Andrew Siegel, S-i-e-g-e-l.

4        All right.  So, Mr. Sorenson, have you had an opportunity

5   to review it to your satisfaction?

6             MR. SORENSON:  I have, Your Honor.  Thank you very

7   much, and I appreciate the time.

8        There are a number of issues here, Your Honor.  I think

9   the first one is going to be this is actually at least two

10  separate transcripts.  The first part appears to be a

11  transcript of a sentencing hearing and it appears to jump

12  around quite a bit.  But it's unrelated to this witness in its

13  entirety.

14            THE COURT:  Okay.  So -- so I guess first of all,

15  Mr. Williams, as I understand Mr. Sorenson, part of his

16  objection is that this is not a complete document because

17  apparently -- well, first of all, we can tell the page

18  numbering isn't entirely consistent from 1 through 668.

19       And second, I believe it's the sort of the subject matter

20  is -- doesn't appear to be involving Agent Lavelle.

21       So what's your position on this document?  And if you

22  could clarify if you're intending to ask the court to receive

23  it into evidence.

24            THE DEFENDANT:  Well, the only part that regard him

25  is page 251 to 268.  That's his actual testimony.

UNITED STATES DISTRICT COURT

1           MR. SORENSON:  And that's correct, Your Honor.

2           THE COURT:  Okay.

3           MR. SORENSON:  And the problem with those pages is

4  we don't have any certification on this transcript.

5           THE COURT:  Okay.  So first of all, are you -- do

6  you want -- are you going to be asking this court to admit

7  it --

8           THE DEFENDANT:  Yes.

9           THE COURT:  -- into evidence?  Okay.  In its

10  entirety?

11          THE DEFENDANT:  Yes.

12          THE COURT:  Okay.  So I'm not going to admit it into

13  its entirety --

14          THE DEFENDANT:  Well, just the portion that he's --

15          THE COURT:  So Agent Lavelle's testimony?

16          THE DEFENDANT:  Yeah, his testimony.

17          THE COURT:  So help me understand why it's relevant

18  to his testimony today or with regard to this case against you.

19          THE DEFENDANT:  Well, like he said, he was the one

20  that was there that when they took my badge and stuff off me,

21  he testified about the homeowners in Florida in my case that

22  they interviewed and things like that.  So I wanna be able to

23  question him regarding that because he was part of the

24  investigating my mortgage company and Common Law office there

25  with Megan Crawley here.  They both was in contact with each

UNITED STATES DISTRICT COURT

1    other.

2         Also, they were also the two agents that went to Texas and

3    got all my, you know, office stuff from my mom's house too.  So

4    he was there at that -- you know, at that location also.

5              THE COURT:  All right.  So he's here, so you can ask

6    him questions about that, but I'm not going to permit this to

7    be entered into evidence because I also note there's

8    handwriting, I assume by you, that has commentary with regard

9    to the testimony, such as on page 259 it says in handwriting,

10   "Damn liar, had no witnesses."  And I believe there are others.

11             MR. SORENSON:  A number of other notations, Your

12   Honor.

13             THE COURT:  On page 260, "I did not say, Your

14   Honor," et cetera, so that would be statements that he didn't

15   make nor were a part of the official transcript.

16        However, you can use this to refresh his recollection or

17   to impeach him, if you wish.  I'm just not going to receive it

18   into evidence.  You can confront him with the statement in your

19   questions, but I cannot receive it into evidence and have it

20   published to the jury.

21             THE DEFENDANT:  That's fine.

22             THE COURT:  All right.  So any other issues and then

23   we'll bring in the jury?

24             MR. SORENSON:  No, Your Honor.

25             THE COURT:  And if you could bring Agent Lavelle in


                    UNITED STATES DISTRICT COURT

```
 1              THE WITNESS:  It's okay.

 2              THE COURT:  Part of the job.

 3              THE WITNESS:  Thank you.

 4              THE COURT:  You're excused for today.  Please don't

 5   talk to anybody about your testimony or until the completion of

 6   your testimony.

 7         Okay.  So any issues that we need to take up before we --

 8              THE DEFENDANT:  Yes.

 9              THE COURT:  What is it, Mr. Williams?

10              THE DEFENDANT:  Do I have to wait till he leave

11   or --

12              THE COURT:  Yes, that's a good idea.

13         All right.  The record will reflect that Agent Lavelle's

14   no longer in the courtroom.

15         Mr. Williams.

16              THE DEFENDANT:  Yeah.  I asked him about federal

17   charges.  I didn't ask him about state charges.  Since he

18   brought up those state charges, I have the trial transcript for

19   the whole trial 'cause he just lied on the stand and said that

20   it was for mortgage reduction and that's not what the trial was

21   about.

22              THE COURT:  Well, you can -- you can try to impeach

23   him if he gave a statement under oath in the transcript.  If

24   it's just -- he didn't testify at it, then you can't confront

25   him with other people's testimony.
```

UNITED STATES DISTRICT COURT

1          THE DEFENDANT:  But, no, he -- what he stated, he

2     stated that the trial was about mortgage fraud and that was not

3     the trial -- what the trial about.

4          THE COURT:  Okay.  And you can ask him about that

5     and confront him with that, like, with it.  I'm not going to

6     put the entire trial transcript in evidence because the

7     majority of that's going to be irrelevant, but you can show him

8     and ask him to review a part of it or whatever and, you know,

9     Does that refresh your recollection?  It had nothing to do with

10    mortgage reduction or what have you.

11         THE DEFENDANT:  Well, see, he wouldn't have been

12    sitting in the rest of the trial, you know.  He only sat in his

13    portion.  So he don't know what was testified, and so he's

14    making a comment that what was testified to by the -- and there

15    was no victim.  There was no homeowner that made a complaint.

16    That was not what the charge was.

17         THE COURT:  Okay.  So you can ask him what he

18    understands the charge was.  He's testified what he testified

19    about and if you believe that he's mistaken or lying or what

20    have you, you can point out to him, for instance, Isn't it true

21    it was about identification theft? -- or whatever.  I'm not

22    sure what the case was about.  I just used that as an example.

23         And if he says -- and not mortgage refinancing, or what

24    have you, and see what his answer is.  If he agrees with you,

25    then we move on.  If he doesn't agree with you, then you may

UNITED STATES DISTRICT COURT

1  want to show him something and have him take a look at it, ask

2  him if that refreshes his recollection that, in fact, the trial

3  was about something else.

4      Okay.  But I'm not going to let the whole trial transcript

5  in evidence because it's not relevant to the issues in this

6  case.  It's going to introduce a lot of other stuff that may

7  confuse the jurors.

8          THE DEFENDANT:  I mean, that -- what he said would

9  confuse them already what he said because now they're thinking

10  that that's what I was charged with and that's not.  And then

11  he said identity theft.  I was not charged -- that has nothing

12  to do with identity theft.  I never been charged or even --

13          THE COURT:  I don't know.  So you can cross-examine

14  him on that.  So I will let you do that, okay?

15      And then I believe we'll be finished after Mr. Williams

16  has an opportunity to question.

17      But with regard to your -- I don't know if you're raising

18  an issue about the trial transcript.  I'm not going to receive

19  it into evidence for the reasons I've stated.

20      Are there any other issues that you want to bring up

21  before we recess for the day?

22          MR. ISAACSON:  Just list tomorrow's witnesses for

23  the government.

24          THE DEFENDANT:  Yeah, a list of witnesses.

25          THE COURT:  All right.  So Mr. Sorenson has handed


UNITED STATES DISTRICT COURT

**EXHIBIT  11**

1    Q    Did Broward initially charge me with unlicensed

2    mortgage broker charge?

3    A    The initial charges, I can't recall.

4    Q    So did the FBI charge me with unlicensed mortgage

5    broker?

6    A    In the Southern District, no, sir.

7    Q    In any district in Florida?

8    A    Not to my recollection, sir.

9    Q    And in your investigation, you -- what would the

10   specific federal charges that you were investigating me for

11   that you felt you had probable cause that my business was

12   committing in Florida?

13   A    The specific charges would have been mail, wire, and

14   mortgage fraud for the Southern District.  Excuse me.

15   Q    So mail, wire, and mortgage fraud.

16   A    Yes, sir.

17   Q    And did you all ever charge me with mail, wire, and

18   mortgage fraud in Florida?

19   A    No, sir.

20   Q    Did you all receive any statements from any clients

21   that was written to your office stating that I committed fraud

22   against them, that I scammed them or defrauded them?

23   A    No, sir.

24   Q    And in your investigation, you found out that I got

25   offices in multiple states, correct?

UNITED STATES DISTRICT COURT

1    A    Yes, sir.

2    Q    And do you know what those states were?

3    A    As specifically off the top of my head, Hawaii,

4    here, and California, and perhaps Tennessee.

5    Q    What about Texas?

6    A    Yes, sir, Texas.

7    Q    Were you one of the agents that searched my mom's

8    home, took her computer, took the files out of her home office?

9    A    I was present, yes, sir.

10   Q    Okay.  So you know I had a office in Texas.  Now, in

11   your investigation in your collaboration with the Texas FBI

12   office, how many clients in Texas filed charges against me, my

13   company, or my mother for fraud?

14   A    I don't recall, sir.

15   Q    You don't recall or you don't recall there's any?

16   A    I don't recall that there's any.

17   Q    In California, were you in contact with the FBI

18   agent or office there?

19   A    Yes, sir, for specifically for the Ventura mortgage

20   event.

21   Q    Okay.  So of all my clients in California that I

22   have, how many clients in California filed any charges against

23   me or made a complaint against me or my company for mortgage

24   fraud or scamming them or anything like that?

25        MR. SORENSON:  Your Honor, I'm going to object

UNITED STATES DISTRICT COURT

1   because he keeps saying how many people filed charges and I

2   think that assumes some kind of legal conclusion.  And it

3   infers that people filed charges.  We just object to the form

4   of the question.

5            THE COURT:  All right.  Overruled.

6       Okay.  If you understand the question, you can answer it.

7            THE WITNESS:  Okay.  No -- no victims in California,

8   to my knowledge and recollection.

9       Q    (BY THE DEFENDANT:)  Okay.  And so you know that

10  upon your investigation, I also have an office in Tennessee,

11  correct?

12      A    Yes, sir.

13      Q    And you know I been -- you know how long I been in

14  Tennessee?  Do you know about the time frame I was in Tennessee

15  before I came to the other states?

16      A    Yes, sir, I was aware of that.

17      Q    Okay.  So you know I was in Tennessee around 2009 --

18  since 2009?

19      A    Perhaps, yes, sir.

20      Q    Okay.  And so you're aware that the FBI office in

21  Nashville also did the same thing that you all did in Florida

22  and had my mortgage company and my common law office under

23  investigation, federal investigation?  You're aware of that

24  too, correct?

25      A    Yes, sir, I was.


UNITED STATES DISTRICT COURT

1    Q    Okay.  And are you aware that one of your agents --

2    fellow agents named Joe Craig was calling around my clients and

3    telling them that I'm a crook, I'm a fraud, I'm not a real

4    minister?  Are you aware that he was doing that?

5    A    No, sir.

6    Q    Did you see the YouTube video that I posted of this

7    confrontation with that FBI office, confronting about them

8    defaming my character and slandering my name, saying I'm a

9    crook, saying my mortgage company is fraudulent?  Did you get

10   to view that video that's on YouTube?

11   A    I don't recall viewing that video, sir.

12   Q    In your communication with the Nashville office, did

13   they tell you that they ever filed any charges since 2009

14   against me, my company, or any of my employees for mortgage

15   fraud, mail fraud, wire fraud, bank fraud, or money laundering?

16   A    They did not file charges.

17   Q    Okay.  So in your investigation, the only state

18   that's ever filed any charges, federal charges against me, is

19   the state of Hawaii; is that correct?

20   A    Yes, sir.

21   Q    Okay.  And are you aware of the federal lawsuit that

22   I had previously filed against you and Agent Crawley?

23   A    A federal lawsuit?

24   Q    Yes, in 2014 and 2016.

25   A    Well, we didn't know each other, I believe, in 2014,

UNITED STATES DISTRICT COURT

1   but I was not aware that you had a federal lawsuit against me.

2        Q     So you was never served at your office that federal

3   lawsuit?

4        A     No, sir.

5        Q     And in Florida, who told you that I was committing

6   these -- or possibly committing these federal crimes?  Like,

7   did you get an anonymous tip?  Or did a client come by and say,

8   Hey, this guy's going this?

9        A     No, sir.  As I said before, it was just basically we

10  viewed your website and Common Law Office of America and your

11  status as a private attorney general, Mortgage Enterprise

12  Investments; it seemed pretty clear to us what was going on

13  from viewing the websites that were attributed to you.

14       Q     So you can tell from a website whether somebody's

15  committing a crime or not?

16       A     No, you can't.  It's a part of an investigation,

17  it's a piece of evidence.

18            THE DEFENDANT:  Can I get the government exhibit of

19  my badge and handcuffs?  I don't know what number that was.

20            THE COURT:  The photograph?

21            THE DEFENDANT:  Yeah, the photograph.

22            THE COURT:  I believe that's 604.

23            THE DEFENDANT:  That's 604.  Now, he's going to have

24  to actually get the actual ID so he can look at 'cause it don't

25  have a picture on the back side of it on here.  But I want him


UNITED STATES DISTRICT COURT

EXHIBIT  12

```
 1          THE JUROR NO. 5:  I'm not sure if it is a conflict
 2    of interest.  My daughter's currently a student in New Jersey
 3    at Seton Hall.  Her interest is political science, and she's
 4    looking for internships all over the place and so she was lucky
 5    to get some.  And I remember seeing that flier of that Common
 6    Law Office of America in her room and she had mentioned that.
 7          And so at this point I'm not sure where I stand as a
 8    mother and what to tell her.  I mean, I can't tell her, but is
 9    there something that I can say?  You know, she's looking up an
10    internship and she's trying to get some here, she doesn't have
11    any law degree.  But, you know, "Oh, yeah, I don't need to have
12    a law degree for that internship," and she's really trying, and
13    I heard that name and so, you know, I'm concerned.  I'm
14    not -- I didn't hear --
15          THE COURT:  You have to keep it closer to your
16    mouth.
17          ·  THE JUROR NO. 5:  Oh.  I didn't hear Mr. Williams's
18    testimony yet, so I don't know.  But as a mother, you know, I'm
19    concerned, and seeing that flier, and -- and what to tell her.
20    And I know I can't say too much, but I'm like really torn that,
21    you know, I need to just say to stop, you know.  She should try
22    internships like the FBI, and she didn't get that, and
23    different things, but I need to just as a mother to -- to tell
24    her to stop.  And, you know, right now she's doing ethics so
25    she's not looking at internships, but I know that's the one
```

1    thing she was looking at.  And I want her to be buyer beware of

2    things.

3          And I don't know -- like I said, I didn't hear

4    Mr. Williams's testimony, I -- I -- and, you know, and I don't

5    know -- you know, I just heard one side.  But I seen

6    that -- that paper and then for some -- and then for some

7    reason, you know, how you get a lot of swishing?  All of a

8    sudden she got a lot of swishing for mortgages.

9          You know, I don't know, maybe it's just out there in the

10   internet, but I -- it's at the same time, you know, came home

11   for winter break, how come, you know, you're getting all this?

12   And I'm not sure if she's looking into things or what, but --

13                THE COURT:  Okay.  Okay.  So -- so you're --

14                THE JUROR NO. 5:  What -- 'cause I --

15                THE COURT:  One of us can speak at a time.  Okay.

16   So your concern is a conflict having to do with your daughter

17   as opposed to a conflict of being a juror in this case.  You

18   feel conflicted how much can you discuss what you've learned in

19   court; would that be fair to say?

20                THE JUROR NO. 5:  Yes.

21                THE COURT:  And your concern is because your

22   daughter has made an application?

23                THE JUROR NO. 5:  I'm not sure where she got, but

24   she said oh, that, you know, she saw this, you know, in New

25   Jersey, close to New York, right?  And so, you know, it --

UNITED STATES DISTRICT COURT

1          THE COURT:  Wait, wait.  So -- so you saw that there

2     was -- there was an internship that's available with the Common

3     Law Office of America?

4          THE JUROR NO. 5:  Yeah.  So that's what I think.

5     I'm not sure, but I can't ask her.  But I remember seeing that

6     flier.  And then she's a graduate of Hawaii Baptist Academy,

7     so, you know, I don't know if it's a Hezekyah, if that's -- you

8     know, I'm just -- I just feel like --

9          THE COURT:  Okay.  So your concern is whether or

10    not -- or how much you can disclose to her of what's the

11    testimony in court?

12         THE JUROR NO. 5:  Yes.  And as a point, I want to

13    tell her, you know, just concentrate on your studies and just

14    forget about internships, but she's really hard head.  You

15    know, like just concentrate of your studies.  And why -- like I

16    say, I didn't hear his testimony, but then as a mother I feel

17    like I need to protect my daughter.

18         THE COURT:  Right.  So -- so you have a general

19    concern that you're not a fan of her getting an internship

20    anywhere; you would rather her concentrate on her studies.

21         THE JUROR NO. 5:  I do, yeah.

22         THE COURT:  Okay.

23         THE JUROR NO. 5:  I mean, we told her that and, you

24    know -- and she kind of thought about that --

25         THE COURT:  So that feeling has nothing to do with

UNITED STATES DISTRICT COURT

```
 1   the Common Law Office of --
 2                THE JUROR NO. 5:  No, it does.
 3                THE COURT:  -- America?
 4                THE JUROR NO. 5:  I saw a flier in her room with the
 5   Common Law Office.
 6                THE COURT:  Right.
 7                THE JUROR NO. 5:  So when they showed the flyer, it
 8   was like Oh, you know, that looks like the flier --
 9                THE COURT:  Right.  You would like her to have a
10   internship, just not with the Common Law Offices of America?
11   You want her to get an internship somewhere.
12                THE JUROR NO. 5:  No, I don't want her to get one
13   right now.
14                THE COURT:  All right.
15                THE JUROR NO. 5:  But she's looking for one --
16                THE COURT:  Right.
17                THE JUROR NO. 5 -- but I'm telling her wait, study,
18   maybe next year.
19                THE COURT:  Okay.  So if I understand you, it has
20   nothing to do with Common Law -- not nothing -- it's not
21   because of Common Law Office of America, but in general you'd
22   rather her pursue her studies rather than get an internship so
23   that she doesn't lose her focus on her studies; is that
24   correct?  You'd rather her do her studies than an internship
25   with anyone?
```

UNITED STATES DISTRICT COURT

1          THE JUROR NO. 5:  Uhm, next year if she wants to do

2     an internship, you know, that's fine.  But I'm just -- you

3     know, from some of the testimony that's coming out about the

4     names and knowing that, you know, this is something that she

5     might want to apply to and I would have a concern, and I'm

6     sorry, it's just that mother instinct where I'm trying to

7     protect my daughter.

8          THE COURT:  Sure.  No, I understand that.

9          Okay.  So do you have any questions from the government

10    with regard to Ms. Aoki's concern?

11         MR. SORENSON:  Maybe just one, Your Honor.

12         THE COURT:  All right.  Please, go ahead.

13         MR. SORENSON:  Ms. Aoki, I just want to get dialed

14    in just a tad here.

15         THE JUROR NO. 5:  Wait.  Let me put my ears on.

16         THE COURT:  Yeah, if you could go by the microphone.

17    Great.

18         MR. SORENSON:  You've actually seen a placard or

19    some type of brochure?

20         THE JUROR NO. 5:  I think I did.  I'm not real sure,

21    but I think I did.  I think I saw it in her room.  And when she

22    did mention, you know, something and I thought she said -- I'm

23    not sure -- I started looking at my email to see what, you

24    know, email she sent me, but it sounded like that.  But I'm not

25    sure, but it sounded like that and sounded like something I

UNITED STATES DISTRICT COURT

1   might have saw.  But I'm not hundred percent.  But, you know,

2   that -- that Hezekyah, and --

3          MR. SORENSON:  Okay.  Is -- I guess my question is

4   is there anything about what you've seen that would affect your

5   ability to be impartial in this case for either party, and also

6   to keep your oath to the Court to not discuss what's going on?

7          THE JUROR NO. 5:  Yeah, so I wouldn't discuss it;

8   however, I would like to send a text, email, something that

9   says, Hey, listen to your mom.  Don't think about any -- any

10  internship, because I feel like I need to, you know, let her

11  know, you know.

12       She has ethics so she's busy now, but after February she's

13  going to be looking and sometimes she doesn't listen to me,

14  but -- and I know she's wanting to get, you know, a job.

15         THE COURT:  Well, so -- so this is sort of the

16  bottom line is you're her mother, so you can tell her no

17  internship or I don't think you should do an internship, you

18  should concentrate on your studies.  Okay.  That's sort of

19  separate and apart from this case.

20       What Mr. Sorenson and myself and Mr. Williams are

21  interested in is anything that you saw in your daughter's

22  emails or pamphlets or flyers that you may have seen, would

23  that affect your ability to be fair and impartial in this case

24  to both sides, what you saw in your daughter's room or you got

25  text from her or emails?


UNITED STATES DISTRICT COURT

1          THE JUROR NO. 5:  Well, I guess -- I guess to be

2    honest, I would tell her not -- you know I would ask her, you

3    know --

4          THE COURT:  No, no, I'm sorry, not having to do with

5    telling -- what you want to tell your daughter.  I'll ask you

6    about that.  But right now as you sit here today, is there

7    something that you saw in your daughter's room --

8          THE JUROR NO. 5:  No.

9          THE COURT:  -- or your emails or text that makes you

10   feel you couldn't be fair to the government or you couldn't be

11   fair to Mr. Williams?

12         THE JUROR NO. 5:  I guess -- like I said, I didn't

13   hear Mr. Williams's -- so I -- testimony, so, you know, he's

14   innocent until proven guilty and that's what I -- I need to

15   learn and I guess we're just hearing like, you know, the

16   statements.

17     But I -- I think I can.  Just sometimes thinking about my

18   daughter and her choices may keep me a little distracted a

19   little bit, but I think I can be -- you know, what can I say to

20   her.

21         THE COURT:  Right.  So you're more concerned about

22   what you can say to your daughter.  That's what you're

23   concerned.  And your concern is that first you don't want her

24   to take any internship; you rather have her be in studies --

25         THE JUROR NO. 5:  For this semester.


UNITED STATES DISTRICT COURT

1          THE COURT:  -- and second you don't want her to do
2     an internship with the Common Law Office of America.
3          THE JUROR NO. 5:  That's correct.
4          THE COURT:  All right.  So do you have any questions
5     for Ms. Aoki, Mr. Williams?
6          THE DEFENDANT:  Yes.  Your daughter lives here?
7          THE JUROR NO. 5:  No.
8          THE DEFENDANT:  Where does she lives at?
9          THE JUROR NO. 5:  She's in the mainland.
10         THE DEFENDANT:  In what state?
11         THE JUROR NO. 5:  In New Jersey.
12         THE DEFENDANT:  Well, my office doesn't offer an
13    internship, so that definitely couldn't have been my office.
14         THE JUROR NO. 5:  Okay.  'Cause -- 'cause she does
15    have the pamphlet.  I'm pretty sure if I go home today and I
16    look for it, it's probably there.  I don't know for sure, but I
17    saw that form before.
18         THE COURT:  Okay.  So.
19         THE JUROR NO. 5:  And so --
20         THE COURT:  So he doesn't offer -- or Common Law
21    Office of America doesn't offer internships.
22         THE JUROR NO. 5:  At all?
23         THE DEFENDANT:  No.
24         THE JUROR NO. 5:  Okay.  Any work opportunities?
25         THE DEFENDANT:  Definitely work opportunity --

1          THE JUROR NO. 5:  Okay.  Maybe work opportunities?

2          MR. WILLIAMS:  Yeah, but not no internship.

3          THE COURT:  Okay.  So like --

4          THE JUROR NO. 5:  Or could be work opportunities

5     also.

6          THE COURT:  Okay.  So she would leave school and

7     work full-time at least for Common Law --

8          THE JUROR NO. 5:  Well, this is like a -- it would

9     be a part-time or what she was describing.

10          THE COURT:  Okay.

11          THE JUROR NO. 5:  Just, you know, when her

12     classes -- when she's not in class, then she can go.

13          THE COURT:  Is that even an opportunity in New

14     Jersey for part-time work?

15          THE DEFENDANT:  No.  I got a office in New York, but

16     not New Jersey.

17          THE COURT:  Okay.

18          THE DEFENDANT:  You know, I don't know about maybe

19     somebody did with -- you know, my former employees did here and

20     maybe somebody done use my name and my company like they've

21     done here.  I don't know.

22          THE COURT:  Right.

23          THE DEFENDANT:  But I'm glad I know that 'cause now

24     I can see what's going on.  See if somebody else done the same

25     thing as what --


UNITED STATES DISTRICT COURT

1          MR. SORENSON:  Your Honor, I'm not sure, but --

2          THE COURT:  Anyway, with regard to your New York

3     office, are you offering any part-time work to college

4     students?

5          THE DEFENDANT:  Not that I -- not that I've

6     authorized.

7          THE COURT:  Yeah.  So, you know, I don't know what

8     that pamphlet has to do with anything.  You're certainly her

9     mother, so you can tell her, you know, whatever you think is

10    appropriate for parenting.  You just can't disclose the

11    testimony and discuss the issues in this case with her.

12         THE JUROR NO. 5:  Okay.  Just --

13         THE COURT:  So apparently from a practical

14    standpoint, according to Mr. Williams, there's no internship

15    opportunity and there's no part-time work that she could apply

16    for as a college student.

17         THE JUROR NO. 5:  Or -- or like just, you know,

18    internships or -- he doesn't have any internships?

19         THE COURT:  Right.  He says he has no internships,

20    and it would be in New York, not New Jersey.

21         THE JUROR NO. 5:  Yeah, it would be in New York.

22    It'd be the New York office --

23         THE COURT:  Okay.

24         THE JUROR NO. 5:  -- 'cause it's close by.

25         THE COURT:  So if he has no internships, she can't

```
 1   apply for internships.  And if he has no part-time job for
 2   college student --
 3            THE JUROR NO. 5:  Or volunteer.
 4            THE COURT:  Well, I mean --
 5            THE JUROR NO. 5:  Okay.
 6            THE COURT:  But that's -- you can certainly talk to
 7   her as a parent.  You just can't disclose any of the testimony
 8   and your thoughts about the testimony to your daughter until
 9   after the whole case is over.
10            THE JUROR NO. 5:  So if I --
11            THE COURT:  But this whole case will be over in
12   March in a few weeks, so after the case is over, you can talk
13   to your daughter.
14            THE JUROR NO. 5:  Okay.
15            THE COURT:  So do you think she's going to apply for
16   something and get a job in the next, you know, four weeks?
17            THE JUROR NO. 5:  I think ethics though is in -- at
18   the end of February.
19            THE COURT:  Yeah.
20            THE JUROR NO. 5:  Or mid February.
21            THE COURT:  Right.  So she's not going to have any
22   time to do it, right?  So once the case is over, you'll be able
23   to discuss the case openly and freely once, you know, the jury
24   has been discharged.  So there should be time for you to talk
25   to her.
```

UNITED STATES DISTRICT COURT

1          THE JUROR NO. 5:  Okay.  And so for now just say

2     please don't do any volunteer work or any internships or

3     anything?

4          THE COURT:  Right, in general, not specifically

5     mentioning Common Law Office of America.

6          THE JUROR NO. 5:  Okay.

7          THE COURT:  Yeah.  So don't discuss anything having

8     to do with that or the Mortgage Enterprise company.  But you

9     can once the case is over and the jury's been discharged.

10          THE JUROR NO. 5:  Okay.

11          THE COURT:  Does that make sense?  Do you have any

12     questions?

13          THE JUROR NO. 5:  No, as long as I can call her and

14     just reiterate that.

15          THE COURT:  Okay.  Very good.  All right.  Why don't

16     you have a seat there.

17     Any questions, concerns, objections anybody wants to raise

18     with regard to what Ms. Aoki has raised before the Court?

19          MR. SORENSON:  Your Honor, I'm just a little

20     concerned that she hasn't been clear enough about being able to

21     be impartial, just that affirmative statement both from

22     Mr. Williams and for the government.  I think we both want to

23     know that she can be, and if she feels like she can't be, then

24     we might have a different position.

25          THE COURT:  Okay.  So I guess the question is,

1    Ms. Aoki, you know, I know you're concerned about your daughter

2    and what you can tell her.  I think we've covered that, that

3    you can't talk to her about the case until it's over.

4            But there's another part of it that I asked you a little

5    bit earlier which is because you saw this pamphlet in your

6    daughter's bedroom and she may have emailed you or texted you

7    about it, do you think that's going to affect your ability to

8    be open-minded until all the evidence comes in and to be fair

9    to both the government and Mr. Williams in listening to all of

10   the evidence?

11               THE JUROR NO. 5:  I think -- I think I can.  I can.

12               THE COURT:  All right.  So that's all we can ask is

13   that people give their best efforts.  And so -- and I'm always

14   suspicious when people say, "Absolutely," you know, "I'm a

15   complete open mind."

16           But when -- both sides, though, have the right to have

17   jurors who are going to use their best effort to keep an open

18   mind, wait until all the evidence is in and until they sit down

19   with their fellow jurors to discuss the case.

20           Is that something that you can promise to us that you will

21   do in this case?

22               THE JUROR NO. 5:  Yes, I will.

23               THE COURT:  Okay.  Do you have any questions?

24               MR. SORENSON:  No, Your Honor.  Thank you very much.

25               THE COURT:  Any questions, Mr. Williams?


UNITED STATES DISTRICT COURT

1          MR. WILLIAMS:  (No response.)

2          THE COURT:  Okay.  Pass for cause, Mr. Sorenson?

3          MR. SORENSON:  Yes, Your Honor.

4          THE COURT:  Pass for cause, Mr. Williams?

5          THE DEFENDANT:  Can I reserve it?

6          THE COURT:  Okay.  You either got to decide now -- I

7    mean, you have to either object now or not or ask her

8    questions, but there's no basis for me to strike her for cause.

9          THE DEFENDANT:  Yeah, I mean, 'cause I think she

10   still going to have that in her mind.  You know what I mean?

11   So I don't know what she saw and maybe somebody -- you know

12   what I mean?

13         THE COURT:  Right.

14         MR. WILLIAMS:  I mean, that's the reason why I'm

15   here now because some former employees, what they did, so I

16   don't know.

17         THE COURT:  Okay.  All right.  So I don't see a

18   basis to strike her for cause at this time given her answers to

19   the questions that were raised, and what the issue is.  I think

20   it's more a greater concern about her daughter and what her

21   daughter should be doing with regard to her studies.

22       Okay.  So why don't you sit there.  We'll take the

23   microphone from you and we're going to bring the rest of your

24   colleagues back.  All right?

25       We're in recess.


UNITED STATES DISTRICT COURT

```
1                    (A recess was taken.)

2                    THE COURT:  Yes, Mr. Williams?  We're not on the

3    record.   Did you want to be on the record?

4                    MR. WILLIAMS:  Yes, ma'am.

5                    THE COURT:  Okay.

6                    MR. SORENSON:  Your Honor?

7                    THE COURT:  Yes.

8                    MR. SORENSON:  There's a juror in the box.

9                    THE COURT:  Yes.

10                   MR. SORENSON:  I'm a little concerned about --

11                   THE COURT:  Right.

12                   MR. SORENSON:  -- the dialog, so --

13                   THE COURT:  Yes.  So I'm going to -- before we go

14   back to the record, I'm going to have her escorted out.

15                   MR. SORENSON:  Okay.  Thank you.

16                   THE COURT:  Yeah.  All right.  So, Donna, if you

17   would escort Ms. Aoki out and just have her wait in the hallway

18   until we finish.

19                   (Open court out of the presence of the jury.)

20                   THE COURT:  All right.  The record will reflect

21   Ms. Aoki's no longer in the courtroom.  There are no jurors

22   present.  Present are counsel and Mr. Williams.

23       Mr. Williams?

24                   THE DEFENDANT:  Yeah.  I just want it noted on the

25   record that I do not feel that she would be able to overcome
```

UNITED STATES DISTRICT COURT

1    her reservations 'cause she seemed to be very emotional about

2    her daughter, you know, and she seems to already has her mind

3    made up, hasn't even heard my side, hasn't seen none of my

4    exhibits, hasn't heard any of my witnesses.

5         I just don't feel like she would be able to overcome it,

6    so I just want to put my objection on the record.

7              THE COURT:  All right.  I appreciate that.  And the

8    court reaffirms its prior rulings for the reasons stated.

9    Thank you.

10        Is there anything else we need to put on the record?

11             MR. SORENSON:  Not from us, Your Honor.  Thank you.

12             THE COURT:  All right.  We're in recess.

13             (A recess was taken.)

14             (Open court in the presence of the jury.)

15             THE COURT:  And the record will reflect the return

16   of our ladies and gentlemen of the jury.  We're in the home

17   stretch, so we have 20 more minutes.  The record will also

18   reflect the presence of the attorneys and Mr. Williams.

19        And, Mr. Sorenson, your witness.

20             MR. SORENSON:  Thank you, Your Honor.

21        Q    (BY MR. SORENSON:)  First off, Special Agent

22   Crawley, just a couple little items of housekeeping here.

23             I want you to look at Exhibit 723.  We're going to

24   go back to the bank exhibits, and I'll ask you if you can

25   identify that.


UNITED STATES DISTRICT COURT

**EXHIBIT  13**

1    assisting people here in the state of Hawaii and all across the
2    nation, so they're using technology.
3         Q     Okay.  You just mentioned LegalZoom.  Do you -- are
4    you familiar with the lawsuit that the state bar associations
5    filed against LegalZoom?
6         A     No.  I'm not a party to that.
7         Q     Okay.  If you was to look at the lawsuit, the
8    lawsuit was about --
9              THE COURT:  No, no.  Do you have any objection to
10   this?  Isn't this far afield, Mr. --
11             MR. YATES:  Yes, yes, Your Honor.
12             THE COURT:  I mean, I don't want to earn your
13   paycheck for you.
14             MR. YATES:  I apologize, Your Honor.  Out of scope
15   and improper hypothetical.
16             THE COURT:  All right.  Sustained.
17          So you need to ask her questions in the area that
18   Mr. Yates asked her questions in about what you have to be to
19   be licensed, how she keeps the database.  We're going kind of
20   far afield here.
21         Q     (BY THE DEFENDANT:)  Okay.  So the licensing by the
22   bar is only for members of the bar, correct -- well, from your
23   agency?
24         A     Only people authorized by the Hawaii Supreme Court
25   to practice in state courts come to the Hawaii State Bar

UNITED STATES DISTRICT COURT

EXHIBIT  14

Anthony T. Williams
South Florida Reception Center
DC#: 15014
14000 NW 41st Street
Doral, Florida 33178

March 25, 2021

DeAnna S. Dotson
Attorney at Law
P.O. Box 375
Dana Point, CA  92629-0375

RE: Withdrawal as Appeal Counsel

Dear Ms. Dotson,

I am requesting that you file a Notice of Withdrawal as my counsel, due to the last conversation that we had, wherein, you falsely believed the narrative that the prosecutors expressed that I somehow, deceived my clients into believing that I was a member of the bar or an attorney at law, which I never claimed to be. I do not feel that you will do an adequate job on my appeal, because obviously, you did not take the time to read the whole trial transcripts.  If you did, you couldn't have expressed to me what you concluded over the phone.

Furthermore, I already had trepidations about your age being 78 years old and having to do an appeal of this magnitude, for a trial that lasted 5 weeks and a case that had over 1100 documents filed, is quite evident that you will not file the grounds that are vital to my appeal, nor capable of doing so, such as the followings:

1. Selective Prosecution -- None of the whites were prosecuted which could have been doing the same thing and working in the same office.

2. Speedy Trial Violation - Changed my trial date 8 times, over my objection and extended it past the 70 days each time and sometimes extended it for 6 months to a year.

3. Double Jeopardy - I was already prosecuted in Florida for the same business practices, as was stated in the prosecutions' trial brief.

4. Removal of Bias Juror- Juror who was obviously biased was not removed, even though I emphatically objected, and asked that she be removed.

Please send me in writing, your notice of withdrawal and the copy that you sent it to the court. Thank you.

Sincerely,

/s/Anthony T. Williams
Anthony T. Williams



**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at www.usps.com®.

Dana Point, CA 92629 — OFFICIAL USE

Certified Mail Fee $3.60
Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy) $
☐ Return Receipt (electronic) $
☐ Certified Mail Restricted Delivery $
☐ Adult Signature Required $
☐ Adult Signature Restricted Delivery $

Postage $0.55

Total Postage and Fees $7.00

Sent To Dr. Anna S. Dolson, Attorney at Law
Street and Apt. No., or PO Box No. P.O. Box 375
City, State, ZIP+4® Dana Point, CA 92629-0375

PS Form 3800, April 2015 PSN 7530-02-000-9047   See Reverse for Instructions

7019 0700 0001 5047 7936



**UNITED STATES POSTAL SERVICE®**

HONOLULU
3600 AOLELE ST RM 208C
HONOLULU, HI 96820-9998
(800)275-8777

03/25/2021                                    08:00 PM

| Product | Qty | Unit Price | Price |
|---|---|---|---|
| First-Class Mail® Letter | 1 | | $0.55 |

    Dana Point, CA 92629
    Weight: 0 lb 0.50 oz
    Estimated Delivery Date
       Tue 03/30/2021

| Certified Mail® | | | $3.60 |

    Tracking #:
    70190700000150477936

| Return Receipt  delivered 3/30/21 | | | $2.85 |

    Tracking #:
    9590 9402 5043 9092 5496 00

| Total | | | $7.00 |

                    C 1432

confirmed receipt!



SENDER: COMPLETE THIS SECTION

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

D Anna S. Dobson,
Attorney at Law
P.O. Box 375
Dana Point, CA 92629-0375

9590 9402 5043 9092 5496 00

2. Article Number (Transfer from service label)
7019 0700 0001 5047 7936

PS Form 3811, July 2015 PSN 7530-02-000-9053   Domestic Return Receipt

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X _____ ☐ Agent
☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:   ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

---

CERTIFIED MAIL® RECEIPT
Domestic Mail Only

For delivery information, visit our website at www.usps.com®.

OFFICIAL USE

Certified Mail Fee   $3.60
Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)       $
☐ Return Receipt (electronic)     $0.00
☐ Certified Mail Restricted Delivery $
☐ Adult Signature Required        $
☐ Adult Signature Restricted Delivery $
Postage   $0.55
Total Postage and Fees   $7.00

Sent To   D Anna S. Dobson, Attorney at Law
Street and Apt. No., or PO Box No.   P.O. Box 375
City, State, ZIP+4®   Dana Point, CA 92629-0375

PS Form 3800, April 2015 PSN 7530-02-000-9047   See Reverse for Instructions

---

UNITED STATES
POSTAL SERVICE.

(800) 275-8777                        03:00 PM

         Qty   Unit        Price
               Price

First-Class Mail®   1               $0.55
Dana Point, CA 92629
Weight: 0 lb 0.50 oz
Estimated Delivery Date
Tue 03/23/2021

Certified                            $3.60
Tracking #:
   70190700000015047936

Return Receipt                       $2.85
Tracking #:
   95909402504390925496 00

Total                                $7.00

**EXHIBIT 15**

# *Leonard G. Horowitz*

DrLenHorowitz.com
Editor@MedicalVeritas.org

Editor-in-Chief, Medical Veritas International, Inc.
5348 Vegas Drive, Suite 353
Las Vegas, NV 89108
Telephone: 310-877-3002

October 20, 2020

The U.S. District Court, District of Hawaii
The Honorable Leslie E. Kobayashi
xxxxxxxxxxxxxxxxxxxxxxxx
Honolulu, HI 96850

**RE: Petition for the Release of Anthony T. Williams from Jail in Hawaii**

Dear Judge Kobayashi,

You probably remember me as a plaintiff in *Horowitz et. al, v. Stewart Title Guaranty Co., et. al.* (Civ. No. 16-00666LEK-KJM), and as a defense witness in the related case of *State of Hawaii v. Anthony T. Williams.*

You may recall that I stated under oath that Mr. Anthony Williams acted in good faith to defend my real property title and financial interests from being stolen by Stewart's wrongdoing that aided-andabetted subsequently indicted attorney Paul J. Sulla, Jr, currently charged with forging my Warranty Deed to steal my property.

You may recall from my case against Stewart Title that their agents at First American Title acted to steal my money and property in an alleged conspiracy with Mr. Sulla and/or his predecessors-ininterest.

These actions intertwine with the ongoing criminal case, 3CPC-19-0000968, in *State of Hawaii v. Paul J. Sulla, Jr. and Halai Heights, LLC*, in the Third Circuit Court.

Additionally, ongoing in that court at this time is Civ. No. 14-1-0304, in which Mr. Sulla's motion for summary judgment to consummate his deed conversion scheme to steal my property by forgery is being adjudicated, despite his indictment by the State for theft in the first degree.

In other words, your 'Honorable Court' contributed substantially to my compounding damage, and multiplied Mr. Sulla's compounding crimes against me and many others. You not only ruled to deny my right to due process and justice in that *Stewart* case; denied my proceeding further with a licensed attorney; denied my motion to file a second amended complaint; denied Stewart owed a duty to defend my property title against Mr. Sulla; and dismissed my case "WITH PREJUDICE" stating despite evidence and verification to the contrary. You wrote, "Plaintiffs have neither shown Defendants knew about any of these [criminal] events at the time they entered into their respective agreements with

1

Royal, nor explained how Defendants owe a duty to Plaintiffs;" (Final Judgment, p 23) Then, you enabled the incarceration of the only man, Mr. Williams, who aside from Prosecutor Rick Damerville in Hilo, attempted to help me, my family, and religious ministry defend my title and property against the alleged white collar organized crimes committed by Mr. Sulla and Stewart's agents at First American who were evidenced to have committed similar torts and crimes in the past damaging other victims.

Given this alleged pattern of unconscionable injustice that I have witnessed in your Court, I cannot expect your leniency to rule in favor of Mr. Williams. I can't expect you to set him free, after serving four (4) years in prison for allegedly practicing law without a license, and allegedly bilking clients like me with sham mortgage transfers to help secure their valid titles and interests against menaces like Sulla.

Knowing the way you rule, I cannot naively believe that you will reverse these injustices, nor recognize that Mr. Williams never committed any alleged crime with any ill intent (i.e., no criminal *mens rea*).

Instead, I expect that you would rule to continue Mr. William's rotting, beatings, and civil rights deprivation in jail indefinitely.

Despite hardened criminals being released from Hawaii jails due to COVID-19, I expect that you will continue his incarceration denying his freedom. Presumably, because he is a Black man whose incarceration matters only to reduce the threat to society committed by his good-faith, well-informed, defense of the rights and properties of poor people defrauded by banks, title companies, and courts like yours, I don't expect your leniency.

In fact, I hold no hope that you might repent, and turn from your pattern-and-practice of administering injustices shaming your Court and law enforcement in Hawaii, denying innocent deserving people's civil rights, lives, liberties, and properties.

Based on my personal knowledge, belief, and evidence in correspondence with Mr. Williams and his privies, his only mistake was that he trusted courts like yours and several untrustworthy people, including Edna Franco, who recruited victims of mortgage fraud for attorney Sulla. Ms. Franco was indicted, fined, but never served a day in jail, to my knowledge. It appears that she made a plea bargain and turned state's witness against targets like Mr. Williams, protecting villains including Sulla.

I had personally requested Mr. Franco's service to society, encouraging her to notify police about Mr. Sulla's string of alleged crimes to no avail. Instead, she neglected to file a police complaint, and continued to defraud foreclosure targets such as myself. It is unfair and unjust that Ms. Franco escaped the justice Mr. Williams has experienced beyond reason.

Mr. Williams regularly helped people. He educated them about their rights, while exposing corruption in the government and banking industry. As I stated in my sworn testimony, some of the things that Mr. Williams told me I was skeptical about, so encouraged me to do my own research. This awakened me to the systemic fraud and corruption ongoing in your profession damaging Americans nationwide.

Mr. Williams never misrepresented himself to me as a licensed attorney. Instead, he educated me about his firm conviction that he had the right to represent poor people and victims of foreclosure fraud as a "Private Attorney General," not as a bar (licensed) attorney. Assuming that he made a mistake under Hawaii law, or wrongly charged people fees to secure their mortgage interests and equity, surely a four (4) year incarceration has adequately repaid his debt to society for these alleged crimes.

I know that Mr. Williams, as a firm believer in God, does not have the disposition to scam people, only help them. He did this boldly, which is why he was prosecuted far beyond his cohorts, such as Ms. Franco.

I was with Mr. Williams on several occasions when we went to local law enforcement agencies, and into courts, and boldly represented victims and defendants' interests. He always acted professionally, courteously, and tried to explain the law to his clients and antagonistic judges. If we had more people like Mr. Williams confronting injustices in our judicial system, we would have a far better, healthier, and safer nation.

It is my understanding that Mr. Williams's co-defendants, Anabel Cabebe and Henry Malinay, have not served a day in jail for allegedly defrauding Mr. Williams and their clients. It is not right that Mr. Williams has served justice alone in jail for four (4) years for alleged crimes others are accused of committing.

I close by quoting Mr. William's favorite law book, *The Bible*. Malachi deals prophetically with erroneous judgment, and Deuteronomy that serves curses upon the wicked:

"Ye are cursed with a curse: for ye have robbed me, even this whole nation." (Malachi 2:9) "And I will come near to you to judgment; and I will be a swift witness against the sorcerers, and against the adulterers, and against false swearers, and against those that oppress the hireling in his wages, the widow, and the fatherless, and that turn aside the stranger from his right, and fear not me, saith the LORD of hosts. (Malachi 2:5) "Cursed be he that perverteth the judgment of the stranger, . . . Moreover all these curses shall come upon thee, and shall pursue thee, and overtake thee, till thou be destroyed; because thou hearkenedst not unto the voice of the LORD thy God, to keep his commandments and his statutes which he commanded thee."

Let Mr. Williams, this 'stranger,' go free, because his incarceration for nearly 4 years has already paid his debt to society.

Sincerely yours,

Leonard G. Horowitz

Cc: A. Williams

3